J. S. THOMAS *v.* FIRST NATIONAL BANK OF GULFPORT.

[58 South. 478.]

1. **FORGERY.** *Elements of offence.  Banks.  Payment of draft on fraudulent endorsement.  Liability of bank to owner.*

   Where a bank check is payable to the order of a person and another person of the same name of the payee gets hold of it and indorses it to a party who takes it in good faith and for value, such party acquires no title to the check.

2. **SAME.**

   If the indorsement in such case is made by a person who is not the real payee, but has the same name as the real payee, is made by such person with full knowledge that he is not the real payee, and with intent to perpetrate a fraud his indorsement is a forgery.

3. **SAME.**

   Banks taking checks must know the true parties claiming to own them—in fact who do own them, and they act at their peril in paying them.

APPEAL from the circuit court of Harrison county.
HON. T. H. BARRETT, Judge.

Suit by J. S. Thomas against the First National Bank of Gulfport.   From a judgment for defendant, plaintiff appeals.

AGREED STATEMENT OF FACTS.

"It is agreed by and between the parties hereto: That on and previous to the 23d day of October, 1909, the plaintiff, who is a white man and a citizen of said Harrison county, and whose business was that of riding about buying cattle, had on deposit in the First National Bank of De Funiak Springs, Fla., a balance of account of two hundred and eleven dollars, and that the plaintiff (who was then, and for some time had been, living, and is now living, at a point between Gulfport and Lyman, in said Harrison county, but nearest to Lyman, the two points Gulfport and Lyman being eight miles apart) wrote a letter to the said bank at De Funiak Springs, requesting said bank to send said sum of two hundred and eleven dollars to him at Gulfport, by letter, care general delivery, Gulfport, Miss., and in accordance with said instructions of plaintiff, said bank at De Funiak Springs made out its draft No. 12699 for said sum of two hundred and eleven dollars on the National City Bank of New York, payable to the order of J. S. Thomas, intending the plaintiff, and immediately mailed same in the United States postoffice at De Funiak Springs, Fla., addressed as follows: 'J. S. Thomas, Gulfport, Miss.' The plaintiff had theretofore been writing some of his letters from Lyman, Miss., and some from Gulfport, and had been getting his mail, some at Lyman and some at Gulfport. However, the letter written by plaintiff to the said bank at De Funiak Springs was written by plaintiff from said Gulfport. There lived, and had for some years lived, in Gulfport a certain negro named J. S. Thomas, who can and could read and write, and who had a bank account at the First National Bank of Gulfport, the defendant herein (an itemized statement of whose entire deposits in defendant's bank to the date hereof is attached hereto as 'Exhibit C'), and who received his mail at said Gulfport. The authorized signature of said negro was filed by him with the defendant

bank on February 4, 1907, where it still remains. When, by due course of mail, the letter from said Florida bank, containing said draft, reached the United States' post-office at Gulfport, about October 25, 1909, the said negro, J. S. Thomas, was the first of said two persons of said name to call at the general delivery for the mail of J. S. Thomas, and the postal authorities in charge delivered the said letter to him. The said negro opened said letter, and coming into possession of said draft, took it on, to wit, October 26, 1909, during regular banking hours, to defendant's bank, indorsed same, "J. S. Thomas," in his own proper signature and handwriting, falsely representing it to be his own, and that he was the true J. S. Thomas mentioned as payee therein, by so indorsing and presenting said draft, and requested defendant bank to cash the same. The said negro was known to the officer of said defendant bank who was acting as paying teller at the time, but was not the regular teller, as J. S. Thomas, a depositor thereof, and the said officer of said defendant bank having compared the indorsement "J. S. Thomas" on the back of said draft with the signature of said negro, J. S. Thomas, on file, as aforesaid, and finding them to correspond, but without further inquiry, thereupon paid the amount called for by said draft, to wit, two hundred and eleven dollars in cash, to said negro, J. S. Thomas, but said paying officer of defendant took no other means to ascertain the identity of said payee, J. S. Thomas, in the draft, merely paying said money upon its presentation and comparison of signature, as aforesaid. The original of said draft is herewith annexed, marked 'Exhibit A,' and made a part of this agreed statement of facts.

"The said defendant bank, at the close of its business on said October 26, 1909, in making up its items of paper to be forwarded to New York for payment, discovered that the said draft, Exhibit A, was erroneously safeguarded, as now appears on its face, in this,

to wit, that, while said draft was intended to be for the sum of two hundred and eleven dollars, it was stamped with a machine called a protectograph, which had been caused by said De Funiak Springs bank to be erroneously stamped thereon, 'Not over five dollars, $5.00,' and thereupon, on said date, said defendant bank sent the said draft by mail to said De Funiak Springs bank, calling its attention to said error, and requesting said Florida bank to send another draft in its place and stead properly safeguarded, which letter reached said Florida bank on the next day, October 27, 1909, and said Florida bank on the same day took up and retained the said first draft, Exhibit A, and on the same day, in its place and stead and in lieu thereof, mailed to defendant bank a new draft, No. 12716, for two hundred and eleven dollars payable to said defendant bank, which is herewith annexed as 'Exhibit B,' and made a part of this agreed statement of facts, which said last draft was duly received by said defendant bank and by it at once forwarded to New York, where it was paid in full to defendant bank out of the funds of the said First National Bank of De Funiak Springs, Fla., by and in the said National City Bank of New York, as is the banking custom in such cases. The amount was charged by the said Florida bank against the account of plaintiff and balanced same. That the receipt and opening said letter containing said draft, and cashing of the same at the defendant bank, and the indorsement and presentation of the same by said negro, J. S. Thomas, were all and singular without the information, knowledge, or consent of the plaintiff, J. S. Thomas, and that upon learning from said Florida bank, upon inquiry, that the said sum of money, to wit, two hundred and eleven dollars, the proceeds of said draft, had been paid to the defendant bank, he went on, to wit, November 5, 1909, to said defendant bank and claimed said draft and proceeds thereof, and demanded payment of the same by the de-

fendant to the plaintiff, as the true owner of said draft, and then and there notified said defendant bank that said indorsement was a forgery, and that he had not indorsed the same. The defendant bank refused to pay said sum of two hundred and eleven dollars, or any part thereof, to the plaintiff, and still refuses, though often requested. Upon said demands being made, said defendant bank notified the United States postal authorities and the police authorities of the said city and endeavored to have said negro, J. S. Thomas, arrested, and requested plaintiff to have him arrested, or ascertain his whereabouts, for such fraudulent conduct and acts; but said negro was not found after search by all said parties, and it is believed by the parties that he left said community after having received said money on said draft as aforesaid.

"The plaintiff, J. S. Thomas, had also formerly been a depositor at the said defendant bank, but closed his account there September 14, 1908, and has done no business with said bank since said date. On the books of said defendant bank the address of said plaintiff, J. S. Thomas, is Lyman, Miss., and said defendant bank, while it was doing business with said plaintiff, sent his statements and other communications to him at Lyman. The said sum of two hundred and eleven dollars, or any part of it, was never placed to the credit of said plaintiff, and he has never received said money or any part thereof, from any source. The said plaintiff knew, when he wrote to the said Florida bank, that one (another) J. S. Thomas had been a depositor and customer of said defendant bank, but did not know him, and had never seen him, but did know that such a person did live, or at least had lived, in Gulfport. That all the indorsements upon said draft, Exhibit A hereto, are now as each originally was after being returned to said Florida bank, but the statement of 'J. S. Thomas' on the back thereof is not the signature of the plaintiff, that is to say, not his hand-

writing, nor was it written there with the knowledge or consent of the plaintiff. The words 'Paid Oct. 27, with our draft No. 12716 favor of First National Bank, Gulfport, Miss.,' were written on the back of Exhibit A by the DeFuniak Springs bank upon issuing Exhibit B hereto. That the negro, J. S. Thomas, who unlawfully took said draft, Exhibit A, as aforesaid, never had any deposit or balance with the said De Funiak Springs bank, and the said draft was not intended for him, but for the plaintiff; but said defendant bank knew nothing of either of said parties named J. S. Thomas having or not having any deposit in said Florida bank, nor which of said parties it was intended to have said draft, and was wholly without knowledge in that regard, but defendant bank did know that the plaintiff had been a depositor in defendant bank, and that his signature was there on file. It is further agreed that said cause may be heard without further pleadings before the judge of the circuit court aforesaid, without a jury, and before the supreme court if an appeal is taken, upon the above statement of facts (and the law applicable thereto), which are all the facts in the case.''

*Geo. P. Money,* for appellant.

Under the facts in this case, as shown in the pleadings and agreed statement of facts, and under our statute abolishing forms of actions, the distinction between conversion and assumpsit for money had and received is immaterial; the declaration shows a good cause of action and that is all that is necessary, as this court has held so often that it is deemed unnecessary to cite the decisions to that effect.

A draft was stolen from the mail, payable to plaintiff's order; and the thief, having placed a forged endorsement upon it, sold it to one McKee, who in good faith collected from the drawer the money, and appropriated it to his own use; upon these facts it was held that the

owner was entitled to recover from McKee. *Shaffer* v. *McKee,* 19 Ohio, 526.

Where a check is not delivered to the payee, but his name is indorsed by another, who deposits it with a different bank than the one upon which it is drawn, which collects the proceeds, which bank is liable to the true owner (the payee) though it acts in good faith and without knowledge of the forgery; and a demand upon such bank for the proceeds, before suit or. by the suit itself, made the check the property of the payee, and recovery could not be defeated on the ground of want of privity. *Farmer* v. *People's Bank* (Tenn.), 47 S. W. 234.

If a negotiable instrument, having a forged indorsement, comes into the hands of a bank, and is collected by it, the proceeds are held for the rightful owner of the paper, and may be recovered by him, although the bank gave value for the paper, or has paid over the proceeds to the party depositing the instrument for collection. 1 Morse on Banks and Banking, Sec. 248.

It is held to be the well-settled rule, ''A check drawn in favor of a particular payee or order is payable only to the actual payee or upon his genuine indorsement; and if the bank mistake the identity of the payee, or pay upon a forged indorsement, it is not a payment in pursuance of authority, and it will be responsible.'' *Pickle* v. *Muse,* 88 Tenn. 381, 12 S. W. 919. To the same effect is *Chism* v. *Bank,* 96 Tenn. 641, 36 S. W. 387. ''The logic of this holding,'' said the court of Tennessee in the case of *Farmer* v. *People's Bank, supra,* ''it would seem, must necessarily be that one coming into the possession of such paper, either unindorsed or with a forged indorsement of the payee's name, could not successfully resist the title of the true owner, or, if it had been converted into money, a demand for its proceeds.''

Where a certificate of deposit belonging to one Talbot was stolen, and by a forged indorsement came into

possession of the defendant bank, which subsequently collected it from the drawee, at the suit of the owner, the receiving bank was held liable for the proceeds of the certificate, though it acted in the utmost good faith and without any suspicion of the fraud practiced upon the true owner. *Talbot* v. *Bank,* 1 Hill. 295.

A check with the name of the payee forged upon it came to the possession of the defendant innocently, and was so collected by it; having done, so, it was compelled to respond to the claim of the true owner, upon his discovery of the loss and fraud, though the bank had already accounted for the proceeds to the party from whom it had obtained possession. The court said: "It is clear, then, that nothing passed to the defendant by virtue of the forged indorsement. The plaintiff's right to the check remained precisely as it was before his name was forged. The check, therefore, when the defendant obtained the money upon it, was the property of the plaintiff; and in that case he may, as we have seen, recover the amount in this action, as money had and received by the defendant to his use." *Buckley* v. *Bank,* 35 N. J. L. 400.

While such an action would be for money had and received, it is held in *Salomon* v. *Bank,* 59 N. Y. Supp. 407, that action for conversion would lie for the amount.

The case of *Farmer* v. *People's Bank, supra,* reviewing the authorities, and coming to the conclusion we have cited, stated that *Johnson* v. *Bank,* 6 Hun, 124, and *Bobbett* v. *Pinkett,* 1 Exch. Div. 368, are to the same effect. These two authorities are not accessible to me.

Upon the objection that the action could not be maintained for want of privity, the court in *Farmer* v. *People's Bank, supra* (47 S. W. 234), says: "Although not actually delivered to plaintiff, yet his ratification by a demand upon the defendant for its proceeds, by this suit, if not before, made the check the property of Farmer, so that when, without any lawful right, the defend-

ant converted it into money, it stood in the place of the original paper, and was equally the property of the plaintiff in error. In the one case no more than in the other, can the defendant in error resist the right of recovery of the true owner upon the ground of a want of privity; for the action against the wrongdoer does not rest upon privity; but upon the fact that he has intermeddled with property not his own, and, asserting a hostile claim, he has interfered with the lawful use and dominion of the owner of the property.''

Negotiable bonds, payable to order, and bearing the indorsement in blank of the payee, were lost or stolen. The finder or thief erased the indorsements, and offered them for sale to the defendant, representing himself to be the person named in them as payee, and was identified as such by a person known to the defendant. The defendant agreeing to purchase, the officer indorsed the bonds with the name of the payee, and received for them their market value. The erasure of the indorsements was so made as not readily to attract attention, and the defendant purchased in good faith and in the regular course of business, and it was held that defendant acquired no title against the owner, who recovered them. *Colson* v. *Arnot,* 15 Am. Rep. 496, 57 N. Y. 253.

Where a bill is payable to the order of a person, and another of the same name obtains possession of it and indorses it to a third person in good faith and for value, the latter acquires no title; and where there are two persons of the same name, and one of them signs that name to certain notes with the intention that they shall be used in trade as the notes of the other, is forgery. *Beattie* v. *Bank,* 174 Ill. 571, 66 Am. St. 318.

In the last named case, the draft sued upon, though intended to be made payable to George P. Bent, was by mistake made payable to the order of George A. Bent, and was then mailed to George A. Bent, Chicago, Illinois. It was there received from the postoffice by a man

named George A. Bent, who indorsed upon it his own name and sold it to the plaintiff, who was a purchaser in good faith. Payment of the draft was refused on the ground that it was a forgery. The trial court sustained this view, and entered judgment for the defendant, which was affirmed.

It will be seen that the last cited case is different from the one at bar in that the drawee refused to pay, and the purchaser of the forged draft brought suit; in the instant case, the First National Bank of Gulfport, appellee here, indorsed the draft after the forged indorsement, thereby contracting that it was not forged (1 Daniel Neg. Inst., 4 Ed., 672) and the drawer bank of Florida paid it by the second draft; and while this case might be clear authority for the Florida bank against the appellee here, and for the appellant here if he had sued the Florida bank, yet this not a question of what other suits might have been brought by the appellant or appellee or the Florida bank; the Beattie case sustains the principles that we have asserted here, and contains a full discussion of the cases on forgery of negotiable paper by forged indorsement of the payee's name by another of the same name who had improperly come into possession of it, all of which clearly hold that the purchaser from such person acquires no title to the instrument, as we have contended. It is shown that the appellant made a demand upon the appellee, both in person and by bringing his suit, thus ratifying the collection of the drafts, and by the authorities first cited to that proposition, the appellee thereby became liable to the appellant for the proceeds of the draft, to wit, the two hundred and eleven dollars which it had collected from the Florida bank. As a further ground of sustaining the suit against the appellee, it seems clear that if appellee has collected money from the drawee of the draft, which the drawer could have refused payment of on the ground of the forgery by the negro Thomas (as

was done in the *Beattie case* in 66 Am. St., *supra*), why
should the appellant be remitted to a suit against the
Florida bank, in another jurisdiction, instead of against
the appellee bank in his own jurisdiction which holds
money it collected by appellant's draft (becoming his
by the demand therefor on appellee), and to which it
has no right under any theory of law or equity? If the
appellee should be compelled to pay the money to ap-
pellant, it would be in no worse position than it was
after paying that sum over to the forger, the negro
Thomas, and it is certainly not entitled to remain in a
better position, at least so far as the appellant is con-
cerned. Had the appellant sued the Florida bank, that
bank could have notified the appellee to defend—
"vouched it to defend"—and upon its failure to do so,
and a judgment had been rendered against the Florida
bank in favor of appellant, the Florida bank could have
sued the appellee here and obtained judgment, as held
in *Bank* v. *Bank*, 94 Am. St. 637, 182 Mass. 230, 65 N. E.
24; the facts in that case are substantially like the case
at bar, both on law and facts.

*Bowers & Griffith,* for appellee.

The appellee made and now makes several defenses
to the demand and action, which, ought to protect it in
this matter, and on the first of which we can do no
better than to quote and adopt the language of one of
the greatest, if not the very greatest, authorities on the
subject. Morse on Banking, pp. 851-853: "The case of
*Graves* v. *Bank* certainly carries the liability of the
bank to an extreme, and it may be an excessive point.
The rule is there laid down, that if a check be made pay-
able to a person, and another person of precisely the
same name, or initials, so far as these are written out
in the check, comes wrongfully or accidentally into pos-
session of same, indorses it, and obtains the money on it
from the bank, still the bank is liable to make good the

amount to the drawer.    The logical sequence which
leads to this goal is clear enough.    The drawer has or-
dered payment to be made to the order of one person,
and it has been made to the order of another; conse-
quently, payment has not been made according to the
drawer's direction, and the bank is not discharged *pro
tanto*.    The indorsement is a forgery.    This is plain
reasoning.    Yet it would seem that the bank ought to be
protected in such a case.    A reasonable limit should be
set to its liability.    It cannot be supposed to have such
cognizance of the private affairs of each depositor as to
know in favor of what individuals he is going to draw his
several checks.    This is clearly impossible.    The depos-
itor orders payment to be made to one A. B.    An A. B.
presents the order and endorses it; the bank knows him
to be A. B., or obliges him to prove himself A. B., and
then pays him.    Without the gift of divination, what
more can they do?    They have used all the means of
identification which the drawer has placed at their dis-
posal, and if these have only led them into error, it is
certainly rather his fault than theirs.    He gives them
nothing but a name to guide them in selecting the payee
from the various members of the community; they do all
that can be done with this sole means of distinction.    If
the name is not enough, but should have been supple-
mented with descriptive language, setting forth the true
payee's profession, abode, place of business, etc., the
drawer should have known this necessity and provided
for it.    If he depends upon the name alone, should he
not be held to take the risk of its sufficiency as a sole
means of identification?    He had some degree of per-
sonal knowledge of the payee, and the bank very prob-
ably had not one particle.    It does its best with the light
it has.    The drawer has not done his best by the light
he had.    Clearly justice demands that the drawer should
suffer in case of error induced by such a state of af-
fairs.    But though the propriety of the ruling may be

criticised, it must be admitted that it lays down the only adjudicated law in the premises, except a remark made in an old case in New Hampshire. The only English authority is to the same effect. It is to be found in the case of *Mead* v. *Young,* which was cited as an authority in *Graves* v. *Am. Bank,* and which appears fully to support that decision. It may be worth noticing, that in the American case Judge Roosevelt dissented. The technical rule of law declaring the indorsement a forgery is too strong for the principles of justice.

A pension agent sent a check addressed to H. and payable to him, but to the wrong postoffice, whereby another person of the same name received the check, forged the indorsement, and got the money. H. recovered of the bank; it had accepted the check, and from that moment held the money for the true payee.

Where a bank pays to another whose name is pronounced like that of the payee, but differently spelled, whether it was negligent is a question of fact on all the circumstances.

This is the true question. It will not do to say the bank has not paid to the person to whom the drawer ordered payment, therefore it is liable; the question is, whose fault is it that a mistake has been made? The bank is only bound to the exercise of ordinary care in obeying the drawer's instructions; if it does this and loss follows, the depositor must bear it, just as if he had been doing the work himself.''

Mayes, C. J., delivered the opinion of the court.

By agreement a jury was waived, and this case was tried by the judge on an agreed statement of facts. It is therefore unnecessary for us to set out at length any statement of the facts. The suit was instituted by J. S. Thomas against the bank for the purpose of recovering two hundred and eleven dollars. The agreed facts show that on and prior to the 23d day of October, 1909,

the appellant in this suit had on deposit in the First
National Bank of De Funiak Springs, Fla., a credit bal-
ance of two hundred and eleven dollars.  Appellant, be-
ing in Gulfport, wrote a letter from that point to the
Florida bank requesting the bank to send the amount of
his deposit to him at Gulfport, care of the general post-
office delivery.  In accordance with this instruction, the
Florida bank sent a draft for the amount on a New York
bank, payable to the order of appellant, J. S. Thomas;
the Florida bank addressing the letter containing the
draft to J. S. Thomas, Gulfport, Miss., care general
delivery.  The appellant was a white man and there was
living in Gulfport at that time a negro by the name of
J. S. Thomas, and this negro also received his mail at
Gulfport.  When the letter containing the draft reached
Gulfport, October 25, 1909, it seems that appellant was
not then in Gulfport; but the negro J. S. Thomas called
for his mail at the general delivery, and the postal au-
thorities delivered the letter intended for appellant and
containing the draft to the negro of the same name.  The
negro opened the letter, and, finding the draft in it, took
it to the First National Bank of Gulfport and indorsed
same "J. S. Thomas," representing that the check was
his and that he was the true J. S. Thomas mentioned
as payee.  The negro was known to the officers of the
Gulfport bank and was a depositor in same.  When the
draft was indorsed to the bank by the negro, the bank
paid the money to the negro J. S. Thomas.    Subse-
quently, the Gulfport bank discovered some little mis-
take in the protectograph stamping of the draft, which
mistake was made by the Florida bank when it issued
the draft.  The Gulfport bank returned the draft by mail
to the Florida bank, calling their attention to the error,
and requesting the Florida bank to send another draft
in its place.  The Florida bank merely retained the origi-
nal draft and in the place of same sent another one for
the same amount, but this time made it payable to the

Gulfport bank; the former draft having been already indorsed to the Gulfport bank by the negro, J. S. Thomas. The draft was finally paid to the Gulfport bank when it was presented for payment in New York. The Gulfport bank had no knowledge of the fact that the negro did not own this draft. Appellant, J. S. Thomas, the white man, subsequently learned from the Florida bank that the Gulfport bank had collected the two hundred and eleven dollars, and when he received this information he went to the Gulfport bank and claimed the draft and the proceeds thereof, demanding that the Gulfport bank pay the same. J. S. Thomas, the real owner of the draft, notified the Gulfport bank that the indorsement was a forgery. The Gulfport bank refused to reimburse the true owner. The negro, J. S. Thomas, in the meantime had left for parts unknown. In other words, the facts of this case conclusively show that the appellant was the owner of the draft, and that the negro who presented it had no interest in it, and had forged the indorsement of the true owner and collected the proceeds from same. Some other facts are agreed to, but we do not think they are important in the consideration of this case. The question in this case is simply this: Where there are two people of the same name, and a check, by accident, reaches the hands of the wrong person, and the person wrongfully obtaining the check indorses his name on same and receives the proceeds from an innocent third party, is such an indorsement a forgery, and is the innocent party protected as against the true owner? The trial court held that it was not such a forgery as would fasten any liability on the bank, and from this judgment this appeal is taken.

There seems to be little dissent in the authorities; almost, if not quite all, the authorities holding that under such circumstances the party paying the check to the one forging the indorsement is not protected. Under such circumstances, it is nothing but a forgery. The

true owner of the check is not placed beyond the pro-
tection of the law because some unscrupulous person
of the same name lives in the same town with him. The
true owner has never parted with his title, and his prop-
erty is not to be taken away from him without his con-
sent merely because the check happens to fall into the
hands of another of the same name.   Banks taking
checks must know the true parties claiming to own them
—in fact, who do own them—and they act at their peril.
Where there are two or more persons of the same name,
it cannot be anticipated that one of them will commit a
crime and forge the name of the other to an instrument
which may have accidentally come into his hands.   The
true owner of the check was guilty of no sort of neglect
which would operate as an estoppel on him.   He had a
right to have his mail sent to him at the general de-
livery at Gulfport.

In the case of *Beattie v. National Bank of Illinois*, 174
Ill. 571, 51 N. E. 602, 43 L. R. A. 654, 66 Am. St. Rep.
318, the court holds that: "Where a bill is payable to
the order of a person, and another person of the same
name of the payee gets hold of it and indorses it to a
party who takes it in good faith and for value, such party
acquires no title to the bill.   If the indorsement, so
made by a person who is not the real payee but has the
same name as the real payee, is made by such person
with full knowledge that he is not the real payee, and
with intent to perpetrate a fraud, his indorsement can-
not be regarded otherwise than as a forgery."   To the
same effect are many cases cited in the opinion in the
above case.

It is true that Mr. Morse, in his work on Banks and
Banking, at page 851, states in his text that under such
circumstances he does not think that the rule announced
above is correct; but he admits in this same text that,
"though the propriety of the rule may be criticised, it
must be admitted that it lays down the only adjudicated

law in the premises, except a remark made in an old case
in New Hampshire;'' and he further says, ''The only
English authority is to the same effect.'' Mr. Morse's
view is that ''the technical rule of law declaring the
indorsement under such circumstances a forgery is too
strong for the principles of justice;'' but he is much
alone in this view. We prefer to follow what seems to
be the settled authority upon this subject, not only be-
cause the authorities are that way, but because we differ
from Mr. Morse and believe that the principles of jus-
tice announced by the decisions are more in accord with
true principles of right than the view stated by Mr.
Morse. It is difficult for us to understand by what
principle of right a man should have his money or valu-
ables taken from him because he has the misfortune,
through no fault of his own, to have the same name as
some other person in the same town. It is difficult for
us to understand how the true owner of a draft may
lose his property rights in same by reason of the fact
that it has fallen into the hands of another person of the
same name and that other person has forged an indorse-
ment of his name to the instrument and obtained money
for it when the true owner knew nothing about it.

In the *Beattie case,* in 174 Ill. 571, 51 N. E. 602, 43
L. R. A. 654, 66 Am. St. Rep. 318, *supra,* the court held
that the true owner of a draft could recover its value
where the person receiving it had the same name, but
not the same middle initial. In other words, in the *Beat-
tie case,* in 174 Ill. 571, 51 N. E. 602, 43 L. R. A. 654, 66
Am. St. Rep. 318, the draft sued upon was made paya-
ble to the order of one George A. Bent, when in truth it
was intended for George P. Bent. The draft was mailed
to George A. Bent, and George A. Bent received it and
indorsed upon it his own name and sold it to a purchaser
in good faith; but the court held, notwithstanding this,
that the purchaser got no title, saying: ''It is true that
the real and intended payee of the draft was named

George P. Bent; but the fact that the name of the real owner and the name of the fraudulent possessor of the draft differed, so far as the middle letter of the name is concerned, does not make the case other than a case where the real name of the payee and the name of the assumed payee are the same.  This is so because the law does not regard the middle initial as a part of a person's name, but only recognizes one Christian name of a party.''

It is readily seen that the above case is a stronger case than this one because there was a difference in the name; that is, a difference in the initial.  But in this case there was not such a difference, but the name was identical.

The case is reversed, and judgment here for appellant.

*Reversed.*

McLEAN, J. (specially concurring).

Whenever a bank pays a check drawn upon it, or upon any other bank, it does so at its peril; it is the duty of the bank to know that it is paying the money to the right party, and if the party presenting the check for payment is not the party, he is necessarily guilty of forgery in presenting the check with the name of the wrong party having been indorsed thereon by him.  The fact that both parties have the same name does not, and cannot, in the very nature of things, alter the question. The fact that one writes his own name across the check, and knowing that the check is payable to another party, is as guilty of forgery as if he had personated another person, and had forged the name of the other person— in truth and in fact, when he does this he is personating another person. The bank must look alone to the party presenting the check for a good title.  Any other doctrine would result in a party losing his property, without any fault on his part.  The rule is well settled that

an indorser guarantees the genuineness of all prior indorsements.

It is an elementary principle that, when one or two equally innocent persons must suffer, he, by whose fault or neglect the loss is caused, must bear the burden. Suppose the check in this case had been made payable to Bill Smith, and that the negro named Thomas had written the name Bill Smith in blank across the back of the check and presented the check for payment, at the same time stating to the appellee that Smith had indorsed the check, could not in that case Bill Smith, the true owner of the check, have recovered his money? We see no difference in principle between such a case and the instant one. The difficulty with appellee is in confusing the real owner of the check with a party who bears the name of the real owner—it fails to distinguish between a name and the person.

SMITH, J. (dissenting).

I regret that I am unable to concur in the conclusion reached by my brethren. My views will be found expressed in 2 Morse on Banks & Banking (4 Ed.), p. 851, better than I can do so myself.

*Suggestion of error filed and overruled.*