OXFORD PRODUCTION CREDIT ASS'N *v.* BANK OF OXFORD.

(In Banc.  Jan. 24, 1944.  Suggestion of Error Overruled March 13, 1944.)

[16 So. (2d) 384.  No. 35474.]

Watkins & Eager, of Jackson, and Ethridge & Ethridge, of Oxford, for appellant.

54

**V. D. Rowe** and **H. T. Holmes,** both of Winona, for appellee.

**L. C. Andrews,** of Oxford, for appellee.

58

Argued orally by **Elizabeth Hulen** and **Pat Eager**, for appellant, and by **L. C. Andrews** and **H. T. Holmes**, for appellee.

**Roberds, J.**, delivered the opinion of the court.

Appellant Association, in this bill in equity, seeks a personal decree against appellee Bank in the principal sum of $5,960.32, the aggregate amount of fifteen checks and one sight draft drawn by the Association, as depositor, upon said Bank as depository, and paid by the Bank upon forged endorsements of the names of the payees therein, and charged by the Bank to the account of the Association; the forgeries having been committed by one E. F. Henderson, who received the money, and who was an employee of said Association.

The Association had a bond with the Fidelity and Casualty Company of New York, under which the Casualty Company agreed and promised to pay to the Association any financial loss the Association might suffer through any dishonest, fraudulent or criminal act of Henderson, and before the institution of this litigation the Casualty Company had paid to the Association the money involved herein, and the Association had transferred and assigned to the Casualty Company all of its rights and claims, in law and equity, against said Bank. The Casualty Company is not a party to this proceeding. In this opinion we shall designate the parties as Association, Bank and Surety.

The Association urges, among other things, that it is entitled to a decree against the Bank because: (1) a depository-drawee-bank is under duty to determine at its peril the genuineness of the signature of an endorsing payee in a check and is liable in all events to the depositor for the money paid on forged endorsement of the payee, regardless of the bank's good faith or freedom from active negligence, and such bank is not relieved of liability by trusting the employee who may be guilty of

the forgeries; and (2) that Association has the right to maintain the suit in its own name, regardless of the aforesaid assignment, and that its right of action is legal and no equitable defenses can be imposed against it, but, if mistaken in this, the equities of the Surety are superior to those of the Bank.

The Bank contends, among other things, that the Association cannot hold it liable because; (a) its negligence in conducting its business was the cause of the loss; (b) that the real party-complainant is the Surety Company; and (c) that the equities of the Bank are superior, or at least equal to, those of the Surety.

The chancellor dismissed the bill and the Association appeals.

The questions arise under these circumstances: The Association is a corporation, created and organized in 1934 under an Act of Congress entitled the Farm Credit Act of 1933, Title 12 U. S. C. A., sec. 1131 et seq., for the purpose of lending money to farmers upon their personal responsibility, and security of personal property, such as livestock, cattle, farming implements, crops, etc. Its territory covered ten counties in North Mississippi, including the counties of Montgomery and Webster. Its domicile is at Oxford in Lafayette County. During the period involved herein, it carried a large checking account with the Bank of Oxford, a banking corporation, also domiciled at Oxford. In February 1935, the Association employed a man by the name of E. F. Henderson, who lived at Kilmichael in Montgomery County. Henderson was a man of good reputation and rather widely known, having acted as deputy tax assessor of Montgomery County under both his father and mother as county assessors. Henderson, shortly after his appointment, became what is known as inspector-representative of the Association in Montgomery and Webster Counties. It was his duty and he had the power and authority to, and he did, take applications for loans from prospective borrowers in those two counties. He attended to the

proper answering by the applicant of all of the questions called for in the application. .He inspected and appraised the property offered as security; prepared the notes and trust deeds securing them and saw to their proper execution by the borrowers. He was a notary public and took the acknowledgements to such papers as needed to be acknowledged, and attended to the recording of the trust deeds. He made detailed, extensive reports to the Association on the standing and financial ability of applicants and of the nature and value of the property offered as security, with recommendations as to whether the loans should, or should not, be made. In cases of renewals or extensions of debts, Henderson recommended and had charge of that. He also made collections from the borrowers and remitted to the Association. In other words, Henderson had the sole duty, authority and responsibility in making loans and collections in Montgomery and Webster Counties and the execution of the papers except that the Association retained the right to make or reject loans recommended by him.

Henderson continued this work until May 1939. During this time, the only supervision exercised over his work by the Association was that the secretary-treasurer thereof visited and conferred with Henderson some seven or eight times, but it is not shown that he in fact inspected any of the properties held as security by the Association other than the property of Henderson himself, who, during the time of his employment, had negotiated two personal loans with the Association.

Beginning on December 14, 1937, and extending to May 26, 1939, Henderson at different times prepared applications to the Association for the sixteen loans involved herein. Fourteen of these supposed applicants were negro tenants residing upon lands of Henderson, and two of them were tenants upon lands of Henderson's sister, which he had under lease and was operating, all lands being in Montgomery County. The majority of these supposed applicants, if not all of them, could neither read nor

write. None of them knew of the applications. Henderson made a lengthy, detailed report to the Association upon the financial responsibility of the applicants ·and the property contained in the applications, recommending. all of the loans. He prepared the notes and trust deeds. He forged all of the names of these tenants to all of the papers and took their supposed acknowledgments thereto as a notary public. He recorded all of the trust deeds. The Association approved the loans and mailed checks to the fifteen supposed applicants to the addresses given in the applications. The draft was delivered in person by the secretary-treasurer of the Association to a Mr. Knight at Winona in ·Montgomery County, who was named as one of the payees as the holder of a lien on the property offered as security. These checks were all payable to the supposed borrowers, but in one of them Henderson was also a payee. It was a part of Henderson's duty to examine the records and ascertain if there were existing liens on the property tendered as security, and, if so, the check would be made payable to the borrower and Henderson jointly so that Henderson would be able to see that the prior lien was satisfied when the check was cashed. Henderson had arranged either to receive these checks through the mails or that the recipients should deliver them to him. He had told these tenants that this was his method of arranging for their supplies. Henderson got possession of all of the checks and the draft and forged the names of all the payees except Knight, who himself endorsed the draft, Henderson forging the name of the other payee. Henderson was well known to the Bank of Winona in Montgomery County. He cashed seven of the checks and the draft at that Bank. Eight of the checks he cashed through local business concerns, who, in turn, deposited them for credit at the Bank of Winona. He cashed one of the checks at the Bank of Eupora in Webster County, which bank in turn sent the check to the Bank of Winona. All of the checks, except one, were forwarded to a bank in Memphis, Ten-

nessee. That bank forwarded them to the First National Bank of Oxford, which bank collected them from the Bank of Oxford. The Bank of Winona mailed one check direct to the First National Bank at Oxford and the draft was collected through a bank in Jackson, Mississippi. The checks and draft were all paid by the Bank of Oxford and charged to the account of the Association.

Henderson was sentenced to a Federal penal institution upon a plea of guilty of forgery.

The Association, shortly after receiving all of these papers, discounted them at the Federal Intermediate Credit Bank at New Orleans and forwarded all of the papers to that institution.

An auditor of the Farm Security Administration would each year mail to one-fifth of the borrowers a written statement of the amount then owing by such borrowers according to the records of the Administration, asking verification of the correctness of the amount. In May 1939, such an inquiry was mailed to one Armsted Stells. Stells was also a tenant on Henderson's farm and Henderson had likewise forged all of his papers, and received the money. Stells replied to this inquiry saying that he did not owe the Oxford Production Credit Association any amount. This resulted in an investigation, and Henderson was discharged. The Stells debt has been paid and is not involved.

The Surety, in its policy, "hereby undertakes and agrees to pay . . . any financial loss through any dishonest, fraudulent or criminal act of any employee . . . of the Association."

On November 2, 1939, the Surety Company, on demand of the Association, paid to the Association the amounts involved herein. About this time, or shortly thereafter, the Association, by writing, transferred and assigned all of its rights and claims against Henderson and his bondsmen as notary public and the Bank to the Surety Company, but, because of an error in the name of the assignee,

the Association, on August 29, 1941, executed another such assignment to the Surety in its proper name.

On February 6, 1940, the Surety wrote the Bank that it had paid these claims and made demand upon the Bank for reimbursement to it. The Bank declined to pay the Surety.

On October 16, 1941, the Surety, in its own name, filed a bill in equity in Montgomery County against the Bank of Oxford and Henderson and the U. S. Fidelity & Guaranty Company, the surety on Henderson's bond as a notary public. After a number of pleas had been filed, that suit was dismissed without prejudice in June 1942, and eight days thereafter, the Oxford Production Credit Association instituted an action in its name against the Bank of Oxford in the Circuit Court of Lafayette County, seeking a judgment against the Bank for the amount of these checks and the draft. Upon motion of the Bank of Oxford, the case was transferred to the Chancery Court of Lafayette County, whereupon the Association filed this bill in that court.

We think that the rights of the parties under the foregoing circumstances are solvable by a decision of these questions: First—The effect of bringing the suit in the name of the Association; Second, the effect of the assignment itself; and, Third, whether the equities of the Surety are superior to those of the Bank.

On the first question, the proof shows that after the Surety dismissed its action in the lower court in Montgomery County, it requested the Association to institute in its name the proceeding in Lafayette County, and that the attorneys for the Surety prepared all of the papers and pleadings and have prosecuted this suit and conducted all of the legal proceedings on behalf of the Association.

Section 505, Mississippi Code of 1930, provides: "The assignee of any chose in action may sue for and recover on the same in his own name, if the assignment be in writing. In case of a transfer or an assignment of any

interest in such chose in action before or after suit brought, the action may be begun, prosecuted and continued in the name of the original party, or the court may allow the person to whom the transfer or assignment of such interest has been made, upon his application therefor, to be substituted as a party plaintiff in said action.''

In Bolivar Compress Co. et al. v. Mallett, 139 Miss. 213, 104 So. 79, this court held that an assignee of a chose in action assigned before suit may sue in the name of the original party or be substituted as a party-plaintiff for the assignor, but in either event the suit is that of the assignee. The court in that case said: ''We have here the real party in interest bringing the action in the name of his assignor who has no interest whatever in the cause of action. The court has jurisdiction of the cause and of the defendants; and the plaintiff, although not before the court in name, is prosecuting the action through his attorneys; . . .''

So, in the case at bar, it could be instituted and prosecuted in the name of the Association, but the suit is entirely for the benefit of the Surety. The Association has been paid and has itself no claim whatever against the Bank. The Surety is the real party-complainant.

As to the Second question—the effect of the assignment —Association, in its able brief, urges, that even though the suit is for the benefit of the Surety and the Surety is the real complainant, its rights and the defenses thereto rest alone upon the legal assignment, and no equitable defenses can be interposed on behalf of the Bank. It then invokes the general rule that a drawee-depository bank has no right to charge against the drawer a check which the bank pays on a forged endorsement of the payee, and that this legal right of the depositor in this case was assigned to the Surety. The Bank answers the first proposition by saying that even as against the depositor the liability does not exist against a bank if the negligent act or conduct of the depositor has contributed to the loss, the bank itself being free of negligence, and that

under the facts of this case, the Association is responsible for the loss, First, by conferring upon Henderson such far-reaching duties and powers, without any supervision over, or check upon, his acts; and, Second, by retaining the checks after they were cashed without itself detecting the forgeries and reporting them to the Bank. Since we place our decision on other grounds, as shown hereinafter, we express no opinion on that question. The Bank further replies that the assignment added nothing to the rights of the Surety; that all substantial rights vested in the Surety by the doctrine of subrogation when it paid the debt to the Association. In this we think the Bank is correct.

The assignment in this record is dated August 29, 1941, a year and nine months after the payment of the obligation by the Surety. There is proof of a prior assignment but the date thereof is not shown, and a fair construction of the evidence on the point is that the prior assignment was subsequent to such payment.

It is generally conceded that, subject to statute, an insurer, on payment of a loss, acquires the right to be subrogated pro tanto to any and all rights which the insured may have against, not only the principal, but also third persons whose wrongful act or neglect caused the loss. The right of subrogation is founded, not upon contract, but upon justice and equity, and rests upon the principle that substantial justice should be attained regardless of form. It is a creature of equity, and is the mode which equity adopts to compel the ultimate payment of a debt by one who, in equity and good conscience, ought to pay it. And the rule applies to contracts of fidelity or guaranty insurance the same as to other insurance and indemnity contracts, and the term "third persons" includes banks who have paid out deposits on forged endorsements of payees. 60 C. J. 695-699; American Bonding Co. v. First Nat. Bank, 85 S. W. 190, 27 Ky. L. Rep. 393; American Nat. Bank v. Fidelity & D. Co., 129 Ga. 126, 58 S. E. 867, 12 Ann. Cas. 666; Louisville Trust Co. v. Royal In-

demnity Co., 230 Ky. 482, 20 S. W. (2d) 71; United States v. United States F. & G. Co., 6 Cir., 247 F. 16; Dantzler Lumber & Export Co. v. Columbia Casualty Co., 115 Fla. 541, 156 So. 116, 95 A. L. R. 258; Borserine v. Maryland Casualty Co., 8 Cir., 112 F. (2d) 409; American Surety Company of New York v. Bank of California, D. C. Or., 44 F. Supp. 81; National Surety Corporation v. Edwards House Co., 191 Miss. 884, 4 So. (2d) 340, 137 A. L. R. 697; American Surety Co. v. Citizens' Nat. Bank, 8 Cir., 294 F. 609; Meyers v. Bank of America Nat. Trust & Sav. Ass'n, 11 Cal. (2d) 92, 77 P. (2d) 1084.

Upon payment by the Surety here, it became vested immediately by the doctrine of subrogation with all of the rights of the Association against the Bank, subject, of course, to the priority of equities as between the Surety and the Bank, as is shown hereinafter. The only effect of a formal assignment, it appears, is to enable a Surety to institute the proceeding in its own name in the absence of a statute so providing. Borserine v. Maryland Casualty Co., supra. Association cites and mainly relies upon Grubnau v. Centennial Nat. Bank, 279 Pa. 501, 124 A. 142, and National Surety Co. v. Bankers' Trust Co., 210 Iowa 323, 228 N. W. 635. The contention of Association that the existence of the formal assignment places the parties on a different basis from that of subrogation finds support in these two cases, but they may be differentiated from the case at bar. Both proceedings were in law courts, and in the Grubnau case the forgery was of the signature of the depositor (which imposes much greater responsibility on the bank than forgeries of endorsements as will be noted hereinafter), and the court also observed "Nor is it a case of subrogation, wherein the equities of the bank may be said to exceed those of the insurer" [279 Pa. 501, 124 A. 144]. In the Bankers' Trust case [210 Iowa 323, 228 N. W. 636], the court said "This action is predicated on an assignment. . . . At the outset, it may be noticed that the theory or doctrine of subrogation is not involved in the instant case." In the case at bar,

the Bank, in due time, moved the circuit court to transfer to chancery the law case which had been instituted in the name of the Association as plaintiff. In support of this motion it set up not only that the Association, by reason of its negligent system of doing business and failure to discover the forgeries, was itself estopped to recover against the Bank, but also that, as between the Surety, which, for satisfactory consideration, had agreed to pay for the wrongs of Henderson, and the Bank, which, as it claimed, had not been negligent, the equities of the Surety were inferior, or certainly not superior, to those of the Bank, and that these equitable defenses could be availed of only in a court of equity. Under this situation the trial judge properly transferred the case to equity under our jurisprudence. When so transferred, proof of all equities and the effect thereof could properly be made and considered, which could not have been done in a law court, as was the situation in the Bankers' Trust Company and Grubnau cases. In Meyers v. Bank of American Nat. Trust & Savings Ass'n, supra, Meyers had a contract with a surety company under which the surety agreed to indemnify Meyers against damage Meyers might suffer as a result of wrongful acts of his office manager. The manager forged endorsements of payees in checks and collected them. The surety paid Meyers, whereupon Meyers assigned, in writing, his cause of action against the Bank which paid the forged checks. Then Meyers brought an action against the Bank and recovered a judgment in the lower court. The same contentions were made there as are made here. The Supreme Court stated them in these words [11 Cal. 2d 92, 77 P. 2d 1085]: "On the part of appellant bank, in effect, it is contended that whatever right plaintiff's assignee may have had to maintain an action against the defendants, ultimately, if at all, its success must have depended upon an application of the doctrine of subrogation. On the other hand, respondent insistently urges the point that since originally he was the owner of an assignable cause of action against

the defendant bank, he also had the legal right to assign it to his indemnitor; furthermore, that because both the right of action and its assignment were legal in their nature, the action was one at law, with the necessary consequence that the equitable doctrine of subrogation was inapplicable." The court rejected the contention of the surety, saying: "In that regard, at the outset, it should be noted that assignment of an assignable cause of action is but one of the recognized forms of subrogation, and that when entitled to substitution in the place of one entitled to institute and to maintain an action, neither a written nor an oral contract is necessary to effect a transfer of such right; consequently, with reference thereto repeatedly it has been ruled not only that a formal, written assignment of a claim of the nature of that here involved adds nothing to the enforceability by the assignee of the cause of action, but also that it is subject to the same defenses as though no assignment thereof of any sort had been made." The court then said that plaintiff placed great reliance on the Grubnau case, supra, and quoted therefrom this rule: "Where an insurance company had paid a loss resulting to insured from the forgery of checks on its deposit at a bank, and had taken an assignment of its cause of action against the bank there was no subrogation wherein the equities of the bank could be said to exceed those of the insurer."

The court then remarked that this holding was out of harmony "with other precedents of like nature," citing a number of cases supporting its conclusion. It then cites and quotes from a number of cases to the effect that the written assignment adds nothing whatever to the substantive rights of the surety. See 60 C. J. 749, sec. 60; American Surety Co. v. Lewis State Bank, 5 Cir., 58 F. (2d) 559; American Bonding Company of Baltimore v. State Savings Bank, 47 Mont. 332, 133 P. 367, 46 L. R. A. (N. S.), 557; Louisville Tr. Co. v. Royal Indemnity Co., 230 Ky. 482, 20 S. W. (2d) 71; New York Title & Mortg. Co. v. First National Bank, 8 Cir., 51 F. (2d) 485, 77 A.

L. R. 1052. We hold that the assignment in this case added nothing to the substantive rights of the surety.

On the Third question—the comparative equities of the Bank and Surety—it is the universal rule that subrogation being equity's method of compelling the ultimate payment by one who in justice and good conscience ought to pay, that it is not an absolute right, but depends upon the superiority of the equity of him who asserts it over the one against whom it is sought. It will never be enforced when the equities are equal. Plaintiff must show a superior equity. "It is well settled that since the doctrine of subrogation is a creature of equity, it will not be enforced where it will work injustice to the rights of those having equal or superior equities." Annotation: 137 A. L. R. 700, and many authorities cited in that note; Southern Surety Co. v. Tessum, 178 Minn. 495, 228 N. W. 326, 66 A. L. R. 1136. It was said in National Surety Corporation v. Edwards House Co., Miss., supra [191 Miss. 884, 4 So. (2d) 341], "When it is sought to enforce the right of subrogation something more must be shown than that defendant could have been compelled by the original creditor to pay the debt and . . . the right of a surety to recover from a third person does not stand on the same footing as the right to recover from the principal." Northern Trust Co. v. Consolidated Elevator Co., 142 Minn. 132, 171 N. W. 265, 4 A. L. R. 510.

Now, applying these rules, are the equities of the Surety superior to those of the Bank? The obligation of the Bank to repay the Association, its depositor, the money it paid out on these forged endorsements does not grow out of negligence on the part of the Bank, in this case but rests upon an implied contract to repay the deposit. Of course a bank, in addition to the implied obligation to repay, may also be negligent, or guilty of fraud, or have knowledge of and participate in the wrongful act of withdrawing the money, and practically all of the cases which have come under our observation holding banks liable to sureties on forged endorsements have

included some such proven factor. See Annotation: 137 A. L. R. 700-706. But that is not the case at bar. The bank here was not negligent. It did not know the payees in the checks nor their signatures. They were obscure persons living in another county. As a practical proposition, the Bank could not, after receiving and before paying the checks, seek out the endorsers and verify their signatures. No bank could operate under such requirement. The rigid rule of duty upon a bank to know at all hazards the signature of its depositors, with whose signatures it is familiar, does not apply to endorsements of payees, with whose signatures they are seldom familiar. Citizens Bank of Hattiesburg v. Miller, 194 Miss. 557, 11 So. (2d) 457. We do not mean to detract in any degree from the obligation of a bank to repay a depositor money it has paid on forged endorsements of payees, where such payment has not been caused by the negligence or fault of the depositor, but we do mean to emphasize that in this case there is no proof of negligence on the part of the Bank. There is only the implied contract to repay. Now, what is the foundation of the right of the Surety? It contracted, for a consideration satisfactory to itself, to indemnify the Association for loss from any dishonest act of Henderson. It did so indemnify and thereby performed a primary obligation for which it had been compensated. In other words, the only obligations involved here are contractual—that implied on the part of the Bank to repay its depositor and that of the Surety to make good any default of Henderson. The only wrong, or negligence here, as between the Surety and the Bank, is that of Henderson. Henderson was the sole cause of the money being paid out—and the Surety had contracted to pay for his wrong. If neither the Bank nor the Surety was the wrong-doer, but, by independent contract obligation, each was liable to the Association, then the satisfaction of such primary obligation by the Surety would not entitle the Surety to recover against the Bank under the doctrine of subrogation, the Bank not being a wrong-

doer. It is not seen how the Surety can have a superior equity to the Bank under these conditions. The great weight of authority supports this conclusion. American Surety Co. v. Citizens' Nat. Bank, American Bonding Co. v. State Savings Bank, American Surety Co. v. Lewis State Bank, Meyers v. Bank of American Nat. Trust & Savings Association, Northern Trust Co. v. Consolidated Elevator Co.; Louisville Trust Co. v. Royal Indemnity Co., all supra; New York Title & Mortg. Co. v. First Nat. Bank, 8 Cir., 51 F. (2d) 485, 77 A. L. R. 1052, certiorari denied 284 U. S. 676, 52 S. Ct. 131, 76 L. Ed. 572; Washington Mechanics' Savings Bank v. District Title Ins. Co., 62 App. D. C. 194, 65 F. (2d) 827; Baker v. American Surety Co., 181 Iowa 634,, 159 N. W. 1044; Com., for Use of Coleman, v. Farmers Deposit Bank, 264 Ky. 839, 95 S. W. (2d) 793; United States Fidelity & G. Co. v. Title Guaranty & S. Co., D. C., 200 F. 443; American Surety Company v. Bank of California, D. C. Or., 44 F. Supp. 81.

In Washington Mechanics' Savings Bank v. District Title Ins. Co., supra [62 App. D. C. 194, 65 F. (2d) 830], a bonded employee stole the drawn checks of his employer, forged the endorsements and collected the money, and the Surety, having paid the employer the loss, sought by subrogation to hold the bank responsible for such payments. The court, after observing that subrogation is an equitable remedy which cannot be invoked as a matter of right, without regard to the circumstances of the particular case, but only in cases where justice demands and where the equities of the party asking subrogation are greater than those of its adversary, used this language, which is particularly applicable to the case at bar, "We are unable to see any particular in which the equities of the bonding company are superior to those of the appellant bank. Neither one was guilty of culpable negligence in the transaction. The bonding company, being in the business of guaranteeing for a consideration the faithful conduct of employees, enabled the defaulting

employee to hold the position of trust which he occupied. The appellant bank was acting consistently with the ordinary course of banking business in accepting a check, whose genuineness it had no reason to doubt. It cannot be said that either one of these parties, as compared with the other, was primarily liable for the default. It follows that the equities of neither are superior to the equities of the other in the transaction." Recovery here requires the establishment of an equity in the Surety superior to that in the Bank, and that has not been done.

We find no error in the other assignments.

Affirmed.

### DISSENTING OPINION.

**Smith, C. J.,** delivered a dissenting opinion.

The Oxford Production Credit Association will be designated herein as the Association, and the Bank of Oxford as the Bank. The Bank having paid these checks on forged indorsements of the payees was without the right to charge them to the account of the drawer, the Association, unless the Association "is precluded from setting up the forgery or want of authority," Section 2679, Code of 1930; in the language of this court in Masonic Benefit Ass'n v. First State Bank of Columbus, 99 Miss. 610, 55 So. 408, 413, if the Association "neither by act nor representation, induced (the Bank) to pay out the money on the forged indorsements." To the same effect see Thomas v. First Nat. Bank of Gulfport, 101 Miss. 500, 58 So. 478, 39 L. R. A. (N. S.), 355; Hart v. Moore, 171 Miss. 838, 158 So. 490; 5 Mitchie Banks and Banking, 506; 9 C. J. S., Banks and Banking, sec. 356, par. chap.; 7 Am. Jur., Banks, Section 590. The Association's deposit with the Bank was therefore not reduced by the payment of these checks and the Bank remained indebted to the Association for the amount represented thereby, which indebtedness the Association had the right to and did assign to the Fidelity & Casualty Company. This assignment vested the Fidelity & Casualty Company with the com-

plete title or ownership of this indebtedness, with all the rights incident thereto possessed by the Association against the Bank at the time of the assignment. For this no authority should be required, but if desired see 6 C. J. S., Assignments, secs. 82 and 100; 4 Am. Jur., Assignments, Sec. 95. Consequently, the Association, which, as the opinion in chief points out, sues for the benefit of the Fidelity & Casualty Company, has the right to a judgment here for the amount of that debt, unless the Association itself was precluded or estopped from setting up the forgery at the time the assignment was made. The controlling opinion does not hold that it was so precluded and I have no doubt that it was not.

But it is said, in effect, that had the assignment not been made the Fidelity & Casualty Company would have had a right of action in equity against the Bank under the doctrine of subrogation, because of the payment by it of the indebtedness due the Association by the Bank under its surety contract, and therefore notwithstanding the assignment it must recover, if at all, under that doctrine. A complete non sequitur. Had the assignment been made to a stranger to this surety contract he would undoubtedly have succeeded to all of the rights of the Association in the debt assigned, and no reason that appeals to me has been, and I feel sure I can not be, given for making a distinction in this connection between such an assignee and one who is a party to a surety contract requiring him to pay the assignor the debt assigned. The Fidelity & Casualty Company without the assignment had, of course, a right of action in equity under the doctrine of subrogation, with the assignment it had the right common to all assignees to recover in an action at law to the same extent that its assignor would have had. But, if I am mistaken as to this, the result should be the same.

After holding that the Fidelity & Casualty Company's only remedy is under the doctrine of subrogation, a majority of the court say that no relief can be afforded

it thereunder for the reason that the Bank's equity is superior to its; meaning, that an injustice would be done the Bank should it be required to pay the Fidelity & Casualty Company the debt it owed the Association. In support of this holding it is said in effect, (1) the Fidelity & Casualty Company in paying the debt due by the Bank to the Association simply complied with its promise to the Association so to do, for the making of which promise it had been paid a consideration; (2) the Bank was guilty of no negligence in paying the checks on the forged indorsements of the payees; and (3) payment of the checks was brought about by the wrongful acts of Henderson, for which the Bank can not be charged.

(1) The Fidelity & Casualty Company's right to subrogation, if it had to depend thereon, does not rest on equity's unwritten recognition of such a right, for that right is expressly given it by Section 2959, Code of 1930, thereby abolishing all distinction between paid and gratuitous sureties in this connection. Consequently, the fact that the Fidelity & Casualty Company was a paid surety should not, and in my judgment cannot, prevent the recovery it here seeks.

(2) Conceding, though not admitting, that the Bank was guilty of no negligence in paying these checks on forged indorsements thereof, that fact is wholly beside the mark here. Negligence vel non of the Bank has no part in the consideration of this case, for in paying a check on the indorsement of the payee therein the law charges a bank with the absolute duty to "ascertain at its peril that the indorsement is genuine." Authorities hereinbefore cited, particularly the three Mississippi cases. The Bank would be entitled to no consideration for having paid the checks even if it believed that the indorsements of the payees' names were genuine. But the fact is that it paid these checks without reference to any belief that the indorsements of the payees' names thereon were genuine but for the reason that the genuineness of the indorsements of the payees' names was guaranteed by

other indorsements thereon to the makers of which the Bank could look for reimbursement in event the indorsements of the payees' names should turn out not to be genuine. That the banking business would be hazardous if banks are under the absolute duty to ascertain at their peril that the indorsements of payees are genuine before paying checks is no concern of ours and has no place here, for such is the law from which we have no right to depart. That a forged signature "is wholly inoperative" unless the person aggrieved is estopped from challenging the forgery is a very old rule of the common law and is expressly embodied in Section 2679, Code of 1930. No injustice can be done this Bank by holding it to the performance of an absolute legal duty.

(3) The controlling opinion admits that the Fidelity & Casualty Company was not a party to and in no way responsible for Henderson's forgery of the indorsements on these checks, from which it should follow that its rights against the Bank should not be prejudiced thereby. Liability without fault has no place in equity or the common law.

The decree below should be reversed and one rendered here for the appellant.

### Dissenting Opinion.

**Alexander, J.**, delivered a dissenting opinion.

I concur in the views expressed in the dissenting opinion of the Chief Justice, particularly in the disclosure that the funds paid out by the bank were its own funds, and not those of the Association. This is important since the initial inquiry should involve the nature of the obligation owed by the bank to its depositor, for this is what was transferred by the assignment to the surety company. To give full effect to Code 1930, Section 505, the assignee must be allowed to stand in the shoes of the assignor, and not hobbled in his progress toward his acquired rights by being compelled to proceed while clad in one only.

The obligation of the bank did not arise from a breach of any duty to know the signature of the payee. It arises from its contract with its depositor to pay out the funds of the latter only when authorized by it. In this case, as always, the paying bank accepts the guarantee of prior endorsements at its peril, and not at that of its depositor. The debt assigned to the surety is therefore the debt of the bank to the Association. The bank's explanation that it withholds payment because of some fraud practiced upon its prior endorser by a third person is indeed not relevant. It owes its depositor at all events.

To hold that the surety acquired no rights by the assignment must mean that the debt of the bank is not assignable in the sense that such assignment would transfer all rights of the assignor. This must be true unless the surety by force of some fiction was disqualified from purchasing or otherwise acquiring the rights of the Association. This view in turn leads inescapably to the novel conclusion that the surety could not acquire by assignment the claim of the Association. In other words, the assignment transferred nothing.

Neither we nor the trial court should have been concerned with the principle of subrogation. The suit was brought by the Association, the real creditor of the bank. Even if the fact that the surety company was an assignee suing in the Association's name should be seen as relevant, which I discount, its rights as such ought to be respected and fully enforced. It seems to be overlooked that the surety did not guarantee the fidelity of the bank. It is not suing one whom it had indemnified, or whose integrity it had guaranteed. It purchased or acquired the right to stand in the shoes of the bank's creditor. Let it be supposed that the surety company had not paid the Association for the default of Henderson. It would then be a third party, and its rights as assignee would be honored, for the disturbing factor of subrogation would not have arisen. Does it then, or would it later, forfeit such rights by paying the Association, whether liable

or not, or for whatever reason, the amount which Henderson had unlawfully procured from the bank and its prior endorser? Such view invests the payment by the surety with an unwarranted quality. Here the surety paid what the Bank ought to have paid. We cannot decide whether the surety was, in fact, liable to the Association. Henderson did not defraud it, but the bank. It is quite possible that the surety could have withstood the claim of its obligee, yet because it is a surety its rights have been tainted with fictions borrowed from theories of subrogation. The invocation of the doctrine, however, would operate to invest the surety with a claim, not against the bank, but against Henderson.

When it is realized that the fraud of Henderson did not change the obligation of the bank to its depositor, the question arises as to when or how this obligation was acquitted. The answer of my brethren is that it persisted up to the moment that the depositor assigned this debt to the surety. I am unable to refer this conclusion to any acceptable legal or equitable principle. This view would lend stimulus to depositories to encourage the assignment of debts against them into the dead hands of sureties. The bank has no right to be concerned with any relationship between the association and its employees or its surety. I have been reasoning upon the assumption, but contrary to my views, that subrogation is the basis of appellant's claim. If this principle is involved it would better be derived from the fact that the surety paid a debt which the bank owed to the Association. In this view the principle would rather be effective to give the surety the right to sue the bank.

The debt of the bank to its depositor is not created by Henderson's default, but by the original deposit. The bank has the right to enforce the liability of Henderson. But it has no right to plead the fraud upon it as a defense to its breach of contract with its depositor.

The reasons for its failure to make the deposit good are not available as against an absolute liability. The court

has, in effect, held that the assignor transferred less than it had, or that the assignee received less than was assigned. This dilemma compels the conclusion that if the surety re-assigned the claim to the Association it would become reinvigorated. What the Association has lost is due not to Henderson's act of commission, but the bank's act of omission. It was the bank that was defrauded, and not the Association. It would present a different case had Henderson stolen from the cash drawer of the Association. If he had been a cashier of the bank and had manipulated the account of the Association, and thereby defrauded the bank, it would be the loss of the latter, and not of the depositor.

The case has become complicated by the circumstance that it was transferred to the equity side. In my judgment this should not have been done. It perpetuates the error of refusing to recognize the simple fact that the suit is by the original depositor, and is purely legal. Even if the assignment is imported into the case it remains a merely legal demand. In any event, equity should follow the law and recognize the legal principles, and enforce them as such. We have gone on record hereby that the holder of a chose in action can assign his full rights to anyone provided he be not a surety. I do not overlook National Surety Corp. v. Edwards House Co., 191 Miss. 884, 4 So. (2d) 340, 137 A. L. R. 697, whose facts are clearly distinguishable. The majority opinion unjustifiably repudiates the holding in Grubnau v. Centennial Nat. Bank, 279 Pa. 501, 124 A. 142, and similar cases which are directly in point, and whose reasoning appears sound and unassailable.

I find no place here for counterbalancing equities between the parties. Any willingness to consider this theory first ignores the fact that the parties here are the bank and its depositor. Once this barrier is broken, and one enters the field where the rights of the surety are to be considered, it is necessary next to ignore the fact and force of the assignment. Thus the suit is stripped of its

record status, and the complainant forced to stand alone upon the perilous footing of a subrogee. It is there alone that it is made vulnerable to the attack of comparative equities. Yet if we must follow this reasoning into this arena, we cannot find that the bank has any superior equity. As stated above, it is far from obvious that Henderson defrauded the Association and not the bank. The surety did not guarantee that Henderson would not defraud the bank. The obligation ran, not to the Bank, but, rather, from it to its depositor. The perfidy of Henderson was not the result of any negligence of the Association. It was the result of a criminal act which was not forseeable nor facilitated by the course followed by the Association. The checks were not placed in his hand but in the hands of its payees from whom Henderson fraudulently procured them by his own unaided ingenuity. The bank is not without fault, nor did Henderson directly defraud it. The fraud was practiced upon the party who first cashed the checks. The bank's explanation that it paid these checks upon the guarantee of prior endorsers is no defense. The party ultimately liable for this negligence is the initial payor. The reason the bank accepted the checks was on the faith of the guarantee of these endorsers. Its default is in refusing to pay its depositor the amount of its deposit.

Brushing aside all right in the appellant to sue, and the right of its assignee to sue, and assuming the applicability of the doctrine of subrogation, I cannot find that the bank has a superior equity. There are only two parties at fault here, Henderson and the bank.