367 P.2d 655

**VALLEY NATIONAL BANK OF PHOENIX, a national banking association, Appellant,**

v.

**ELECTRICAL DISTRICT NUMBER FOUR, PINAL COUNTY, Arizona, Appellee.**

No. 6808.

Supreme Court of Arizona.

In Division.

Dec. 29, 1961.

**308**

Gust, Rosenfeld, Divelbess & Robinette, Phœnix, for appellant.

R. J. Ellis, and Whitney & Whitney, William A. Holohan, Phœnix for appellee.

YALE McFATE, Judge.

The appellant will be designated as the "Bank" and the appellee as the "District". The District brought action in the trial court to recover money which had been on deposit in the Casa Grande Branch of the Bank and which had been paid out on checks written by an officer of the District and converted by such officer to his own use. The District is composed of lands in the vicinity of Eloy, Arizona, and was organized under the provisions of the Electrical District Act (A.R.S. § 30–501 et seq.) sometime prior to the year 1947. The account in

question was intended by the District to be an inactive or dormant account although the Bank was never advised of that intention.

In 1947 a "Corporate Resolution" signature card was filed with the Bank showing one Lloyd Buntz as treasurer, as the only person authorized to sign checks on behalf of the District. Sometime prior to this period the board of directors of the District employed one Harry V. Kerrick as their secretary to do the District accounting work and to handle other business of the District. His office in Eloy was used as headquarters for the District, all records were kept there and all mail received there. Most of the board meetings were held in that office.

On or about July 2, 1951, following a change in the membership of the five-man board of directors, the District caused a new signature card containing the usual corporate resolution to be filed with the Bank. The names of the following persons appeared thereon as having been authorized to sign checks on behalf of the District:

John F. Nutt---------President
H. V. Kerrick--------Acting Secretary to the Board
Frank W. Shedd, Jr.----Secretary
Glenn N. Shay--------Treasurer

H. V. Kerrick was never a member of the board of directors of the District and he was never authorized by the board to sign checks for the District. After the signature card had been signed by the other officers and given to him for filing, Kerrick typed his name in on one blank space and wrote his signature on another showing himself to be authorized by the board to sign checks on the account, and delivered the same to the Bank. The Bank made no effort to ascertain whether Kerrick was a member of the board of directors of the District.

Commencing in December, 1951, Kerrick began to write checks on the account payable to himself or others. Before his actions were discovered in September, 1956, he had written, and the Bank had paid about 45 checks in an aggregate amount of $30,795.56. He had used blank checks which had been printed by the District sometime previous and which had the word "Treasurer" printed under the line for signature. He did not otherwise indicate the capacity in which he signed the checks. At no time were more than two or three checks written in one month. During this same period there were numerous deposits of funds of the District to this account.

In September of 1956, the treasurer of the District, Mr. Shay, first became aware of some possible irregularities in the District's Bank accounts. A board meeting was called resulting in an audit which lead to the discovery of Kerrick's defalcations. Embezzlement charges were filed against Kerrick to which he entered a plea of guilty

and in the spring of 1957 he was sentenced to serve a term in the state prison.

None of the members of the board of directors or officers of the District had ever personally made any investigation of Kerrick's background, record or experience; and none of them had, during the period from July, 1951 to September, 1956, ever examined the cancelled checks or bank statements regularly mailed by the Bank to the District. During the period in question the Bank mailed to the District at the address shown on the signature card, regular monthly statements of its account, together with cancelled checks which had been paid and charged to the account. At the time of the audit a large number of monthly bank statements sent out by the Bank were found unopened in the District's files at Kerrick's office. None of the cancelled checks drawn by Kerrick had been seen by the officers until the 1956 audit. The last prior audit of the District was in the year 1949.

The Bank employed approximately 25 persons during this period at its Casa Grande branch office, at least 10 of whom were tellers and bookkeepers. They handled an average of 4,000 checks per day and checks in the amount of $1,000 to $2,000 were not considered unusual in the regular course of business.

After discovering the fraudulent withdrawals from its account, the District made demand on the Bank for payment to the District of $30,795.56. The Bank refused payment on the ground that it had a regular signature card with corporate resolution thereon, signed by the corporate officers authorizing Kerrick to sign checks on behalf of the District. The trial court ordered judgment for the District in the amount prayed for in its complaint.

By its assignments of error and propositions of law, the Bank urges this Court to reverse the judgment for the following reasons:

(1) That a contributing cause of the District's loss and damage was its own negligence in placing in the hands of its employee, for delivery to the Bank, a signature card upon which a blank line was left where the employee could, and did, without authority, write in his own name, as one of those authorized to draw checks on the account; that the District having caused the Bank to rely on the representations of the signature card and pay the unauthorized checks, is now estopped to recover its loss from the Bank.

(2) That even in the absence of statute it is the duty of a depositor to examine statements and cancelled checks returned to it and report irregularities, and the board of directors of the District, having negligently failed to examine the vouchers and statements received from the Bank and having failed to notify the Bank of any inaccuracies or irregularities within a reason-

able time after receipt of same, over a period of five years is now estopped to recover from the Bank its losses occasioned by its own negligence.

(3) That under the provisions of A.R.S. §§ 6–262 and 6–264 the District cannot in any event recover with respect to those checks which were paid by the Bank and returned to the District with a statement of account showing the corresponding debit entries, without any objection or protest by the District within six (6) months from rendition of the account. These sections read as follows:

"§ 6–262. Bank liability for payment of forged, altered or raised checks.

"A. A bank doing business in this state which has paid and charged to the account of a depositor any money on a forged, altered or raised check issued in the name of the depositor shall not be liable to the depositor for the amount paid thereon, unless the depositor notifies the bank that the check so paid is forged, altered or raised:

"1. Within six months after notice to the depositor that the vouchers representing payment charged to the account of the depositor for the period during which the payment was made are ready for delivery, or

"2. In event notice has not been given within six months after return to the depositor of the voucher representing the payment.

"B. The notice referred to in this section may be given by mail to the depositor at his last known address with postage prepaid.

"§ 6–264. Final adjustment of bank statements of account.

"When a statement of account has been rendered by a bank to a depositor accompanied by vouchers, if any, which are the basis for debit entries in the account, or the depositor's passbook has been written up by the bank showing the condition of the depositor's account and delivered to the depositor with like accompaniment of vouchers, if any, the account shall, after the period of six months from the date of its rendition, in the event no objection has been theretofore made by the depositor, be deemed finally adjusted and settled and its correctness conclusively presumed, and the depositor is thereafter barred from questioning the correctness of the account for any cause."

The Bank's contention outlined in No. (1) above, is summarized in its brief as follows:

"The District, through its own actions, was the proximate contributing cause to the embezzlement by Kerrick by furnishing him, through its directors, with a resolution of the District, with

blank spaces left open to permit the insertion of further names. Certainly the better, and defendant believes, the general practice in such cases is to scratch or 'x' out all unnecessary blanks contained in such document to preclude the possibility of their being filled in."

■ Whether the conduct of the District amounted to negligence would depend of course, on all the surrounding facts and circumstances relating to the transaction. In making this determination the crucial question is whether the members of the board as reasonable men, should have anticipated or foreseen that Kerrick would take advantage of the blank spaces to wrongfully insert his own name and fraudulently cash unauthorized checks for his own use. There was no evidence of any fact or circumstance which would serve as notice to the members of the board that Kerrick was not trustworthy. He had been secretary of the board for many years and the board members as well as other people in the community had confidence in him. He had a good reputation in the community. Under these circumstances, the trial judge was justified in finding no negligent conduct on the part of the board members in permitting Kerrick to deliver the signature card to the Bank with blank spaces on it.

We shall discuss now the second and third propositions outlined above, in inverse order.

The third proposition urged by the Bank has to do with the failure of the board of directors of the District to comply with the provisions of A.R.S. § 6–262 and A.R.S. § 6–264 set out above. As related to this case these statutory provisions require simply that the District examine the regular monthly statements received by it within six months, and notify the Bank of its objections to the account, and failing to do so, it is barred from questioning the correctness of the account for any cause. There is no doubt that the facts of the case fall squarely within the purview of the statute unless for some reason the District is not amenable to its terms. The District urges that these sections of the banking code do not apply because under the provisions of Arizona Constitution Art. 13, Sec. 7, it is provided that irrigation, electrical and other districts

"* * * shall be political subdivisions of the State, and vested with all the rights, privileges and benefits, and entitled to the immunities and exemptions granted municipalities and political subdivisions under this Constitution or any law of the State * * *"

and that the statute referred to is a statute of limitation and that where the public interest is involved, laches, estoppel and statutes of limitation have no application.

■ Electrical districts organized under A.R.S. § 30–501 et seq. are distinguishable

from cities or towns. They do not exercise governmental functions except in limited spheres, such as taxation and eminent domain. The statute authorizes their existence primarily for carrying on the business of pumping water for irrigation, not for the benefit of the general public, or for exercising political prerogatives but for the proprietary benefit of owners of farms within the District. Their governmental status is similar to that of irrigation districts organized under A.R.S. § 45–1501 et seq.

In Taylor v. Roosevelt Irr. Dist., 72 Ariz. 160, 232 P.2d 107, affirming 71 Ariz. 254, 226 P.2d 154, this Court held that districts of this type were not immune from tort action, and pointed out the basic limitations on the immunities mentioned in the constitutional provision above set forth.

"As pointed out in our former opinion, the constitutional amendment, Section 7 Article 13, was adopted for the purpose of granting tax immunity to irrigation, power, electrical, agricultural improvement, drainage, and flood control districts, and tax levying public improvement districts. The true character of such districts was analyzed by this court in Day v. Buckeye Water, etc. Dist., 1925, 28 Ariz. 466, 237 P. 636, 638, as follows:

\* \* \* \* \* \*

" 'Districts of the kind involved in this proceeding therefore belong to that class of organizations, once rare but becoming more and more common, established for the pecuniary profit of the inhabitants of a certain territorial subdivision of the state, but having no political or governmental purposes or functions. In some respects these organizations are municipal in their nature, for they exercise the taxing power, the greatest attribute of sovereignty, and can compel the inclusion of unwilling landholders within their bounds. In other ways they resemble private corporations, for they are liable for the torts of their servants in the same manner and to the same extent, and indeed generally have the same rights and responsibilities. Probably the best definition we can give then is to say that they are corporations having a public purpose, which may be vested with so much of the attributes of sovereignty as are necessary to carry out that purpose, and which are subject only to such constitutional limitations and responsibilities as are appropriate thereto.' Maricopa County Municipal Water Conservation Dist. No. 1 v. La Prade, 45 Ariz. 61, 40 P.2d 94, 100.

"The actual operation and functioning of the district after the adoption of the constitutional amendment, supra, was in the same factual manner as at the time of the Day case. The adop-

tion of the constitutional amendment in no sense altered the inherent characteristics of the district. With this observation in mind, we desire to point out that this amendment only attempted to vest such districts with all of the rights, privileges, benefits, immunities, and exemptions granted municipal and political subdivisions under the *Constitution or any law* of the state or the United States. There are no constitutional or statutory provisions exempting municipalities or political subdivisions from tort liability when committed in the prosecution of their governmental or proprietary activities. By court decisions political subdivisions, as distinguished from municipalities, have been vested with immunity from their acts of negligence arising out of purely governmental activities." 72 Ariz. 160, 162–164, 232 P.2d 107, 108.

■ If immunity from statutes of limitations is to be found it must be found in the Constitution or the laws of the state. No such state law or constitutional provision which specifically exempts municipalities from the operation of statutes of limitation has been called to our attention and we are aware of none. Moreover, were we convinced, which we are not, that municipalities are exempt from the operation of the statute of limitations, we would still be compelled to the conclusion that the Dis-

trict's claim of immunity is untenable. A. R.S. § 6–264, supra, is not a statute of limitations but simply provides a condition precedent to the establishment of liability. It does not fix a time limit within which a legal right must be exercised under the penalty of losing it but rather provides that the examination and notice therein required must be performed and given before any liability attaches for the payment of unauthorized checks. Union City Housing Authority v. Commonwealth Trust Co., 25 N. J. 330, 136 A.2d 401. The applicable statute of limitations for bringing an action against the Bank for wrongful payment is not in any way affected by the statute in question.

■ From the foregoing it follows that the provisions of A.R.S. §§ 6–262 and 6–264 are binding on the District in this case. The evidence shows without contradiction that none of the agents or officers of the District either examined its statements and cancelled checks or objected or gave notice of any kind respecting the fraudulent checks, until the overdraft was discovered and reported to the members of the board of directors shortly after August 17, 1956, which is the date the last check was drawn on the account.

■ The District, however, urges that A.R.S. § 30–544 should prevail over the provisions of the banking code, hereinbefore set out. The statute referred to reads:

"§ 30–544. Organization of board; officers; district office

"A. The board of directors of the district shall organize each year by electing from among its membership a chairman, a vice-chairman and a treasurer. The board shall elect a secretary who may or may not be a member of the board, but his duties shall be clerical only if not a member of the board *and he shall not sign or attest checks, orders or legal papers of any kind.* All instruments or papers requiring signatures shall be signed by the chairman of the board, or in case of his absence or inability to act, by the vice-chairman and attested by the secretary, if a member, and if not then by any member of the board, but the board may authorize instruments or papers to be signed by any of the members in special cases." (Emphasis supplied.)

The argument advanced by the District is, "that by the simple device of waiting six months, every check, no matter by whom drawn, would become fixed and unrecoverable by the District" thus nullifying the protection afforded it under A.R.S. § 30–544, and hence the Legislature must not have intended that the provisions of A.R.S. §§ 6–262 and 6–264 apply to electrical districts. We cannot accept these views. There is no actual inconsistency in the two statutes, and each can and should be given meaning and effect. An electrical district which chooses to comply with the requirements of A.R.S. §§ 6–262 and 6–264 is entitled to any protection afforded it under A.R.S. § 30–544 with respect to unauthorized withdrawals from its account. If it chooses not to comply, then it stands in the same position as any other noncomplying corporate depositor.

The question yet remains to be determined who should bear the loss, with respect to checks which were debited against the account *within* six months preceding the date of notification to the Bank of their fraudulent nature. Obviously the bar of the provisions of the banking laws above set forth, does not apply to these checks, and the parties stand before the court on an equal footing, the Bank without the protection of the statute, and the District without governmental immunity. The facts of the case must be viewed in the light most favorable to sustaining the judgment of the lower court if there is any theory of the case upon which judgment can be sustained and any reasonable evidence supporting such theory. On this aspect of the case the District contends that the Bank was bound to know the general laws under which the District was organized; and the statutory limitations on the authority of the secretary to the board; that such laws entered into and formed a part of its contract with the Bank; that the Bank failed to exercise

**316**

diligence in ascertaining whether Kerrick was a member of the board of directors of the District, and in honoring checks which were not drawn by Kerrick in the capacity of secretary to the board, as shown on the signature card, but in the capacity of treasurer for which there was likewise no authority; that the Bank also paid without question or inquiry, checks drawn by Kerrick to payees who bore toward the District business relationships of a highly suspicious and questionable character, e. g., $1,657.36 to a local tavern; $737.85 to a Phoenix Cadillac dealer, $100 to a Phoenix hotel, and 15 separate checks payable to Kerrick personally for amounts of $1,000 or more.

█ It is the law that the relationship between a Bank and an ordinary depositor, absent any special agreement, is that of debtor and creditor. Valley Nat. Bank v. Witter, 58 Ariz. 491, 121 P.2d 414; Stewart v. Phoenix Nat. Bank, 49 Ariz. 34, 64 P.2d 101.

█ A bank is charged with knowledge of the statutes of the state relating to its depositors. The contract between a bank and a public corporation depositor includes the pertinent statutes relating to the authority of its officers and agents, as a part and parcel of the contract. Maryland Casualty Co. v. Central Trust Co., 297 N.Y. 294, 79 N.E.2d 253; Fidelity & Casualty Co. of New York v. Farmers

Nat. Bank, 275 N.Y. 194, 9 N.E.2d 833. A check can be drawn on the account of a corporate depositor or negotiated only by its authorized agent and the authority of such agent is not lightly to be implied. Merchants' & Manufacturers' Ass'n v. First Nat. Bank, 40 Ariz. 531, 14 P.2d 717; 7 Am.Jur. Banks §§ 526, 527.

█ A bank pays an unauthorized check at its peril; if a purported authorization has been fraudulently lodged with the bank, without fault on the part of the depositor, in legal contemplation the payment of checks as a result of the fraud is made out of the bank's own funds, and it has no right to charge the depositor's account with the amount thereof. Moore v. Moultrie Banking Co., 39 Ga.App. 687, 148 S.E. 311; 5 Zollman, Banks and Banking § 3411, (1954)

Guided by the foregoing principles, let us analyze the facts. Kerrick, by presenting the Bank with a spurious signature card, fraudulently induced the Bank to part with its money. Had the authorization been genuine, the Bank, on payment of the orders would have been entitled to charge the customer's account with the amounts thereof. But the signature card on which the Bank relied was not genuine, and in fact Kerrick was not authorized to draw on the account. Under these circumstances, absent any negligence on the part of the depositor proximately contributing

to the Bank's loss, or other conduct amounting to estoppel, the Bank cannot charge its depositor with the amount of its loss resulting from the fraud. We have already discussed the matter of whether the District was negligent in permitting Kerrick to file the card with the Bank. But, aside from statutory considerations, is the District estopped from recovery of these funds by reason of its negligence in failing to timely examine its bank statements and discover the fraud?

The Bank argues it is a general rule that even in absence of statute, a depositor owes a duty to his bank to examine statements of account and cancelled checks furnished him by the bank within a reasonable time and to report any irregularity, and failing to so do, he is estopped from questioning the correctness of the account; that applying this rule, the District is precluded from recovery with respect to the amount represented by those checks not barred under the terms of the statute. We find from an examination of the authorities, that although the general rule is as stated, it is subject to the requirement that the Bank itself be free from primary negligence.

The evidence here shows that although the Bank was bound to know that under the law Kerrick had no authority to draw checks on the District's account unless he was a member of the board of directors, and then only by special prior authorization, it made no attempt to ascertain his status or authority in this respect; that it honored, without question, checks signed by Kerrick as "Treasurer", contrary to the specifications of the signature card itself; and honored over a long period of time, without question, checks drawn in various large amounts, ostensibly for purely personal purposes, unrelated to the business of an electric district. Under all the circumstances, it did not exercise that degree of vigilance which ought to be expected from a bank. Its loss was primarily occasioned by its own negligence.

■ Estoppel is an equitable doctrine, governed by equitable principles, and is not applicable where the one asserting the doctrine has himself been guilty of misconduct toward the person against whom he seeks to have it applied. In Leather Manufacturers' Nat. Bank v. Morgan, 117 U.S. 96, 6 S.Ct. 657, 29 L.Ed. 811, which involved altered checks paid by the bank, the court summed up the principle as follows:

> "Of course, if the defendant's officers, before paying the altered checks, could by proper care and skill have detected the forgeries, then it cannot receive a credit for the amount of those checks, *even if the depositor omitted all examination of his ac-*

*count."* 117 U.S. 96, 112, 6 S.Ct. 657, 663. (Emphasis supplied.)

Further in First Nat. Bank of Philadelphia v. Farrell, 272 F. 371 (3rd Cir., 1921), the court summarized its analysis of the authorities with this statement:

"But the general rule arising from the examination of pass-book or statements by the depositor himself, and the variation of the rule arising from the examination of them by his authorized agent, involve in practically every reported instance wrongdoing where the negligence of the bank was not involved and where the wrongful act was entirely that of a person other than the bank. Both the rule and its variations disappear altogether where the bank has been negligent in detecting the fraud." 272 F. 371, 377.

See also Pacific Coast Cheese Inc., v. Security-First Nat. Bank, 45 Cal.2d 75, 286 P.2d 353; Herbel v. People's State Bank, 170 Kan. 620, 228 P.2d 929; Glassell Development Co. v. Citizens' Nat. Bank, 191 Cal. 375, 216 P. 1012, 28 A.L.R. 1427; Wussow v. Badger State Bank of Milwaukee, 204 Wis. 467, 234 N.W. 720, 236 N.W. 687; 7 Am.Jur. Banks § 516.

The rule advocated by Bank's counsel would shift the responsibility for detection of fraud and forgery entirely on the shoulders of the depositor where loss has resulted from some negligence of the Bank; would invite banks to become lax in the surveillance of their customer's accounts and in the detection of forgeries and other unlawful invasions of such accounts, and would tend to encourage a lower standard of care than should be exercised by banks.

In view of the foregoing, we hold that estoppel does not constitute a defense available to the Bank in this case.

The judgment of the trial court is reversed as to the amount of those checks which are barred by the provisions of A.R.S. §§ 6–262 and 6–264, and the case is remanded to the trial court for entry of judgment for the District for the amount represented by the remaining checks.

STRUCKMEYER, C. J., and BERNSTEIN, V. C. J., concurring.