542 P.2d 39

**LIBERTY MUTUAL INSURANCE COMPANY, a corporation, Appellant,**

v.

**THUNDERBIRD BANK, Appellee.**

**No. 1 CA–CIV 2533.**

Court of Appeals of Arizona,
Division 1,
Department B.

Nov. 12, 1975.

Rehearing Denied Dec. 18, 1975.

Review Granted Jan. 13, 1976.

Gust, Rosenfeld, Divelbess & Henderson, by Harold H. Swenson, Phoenix, for appellant.

Jennings, Strouss & Salmon, by Thomas J. Trimble, I. Douglas Dunipace, Phoenix, for appellee.

## OPINION

FROEB, Judge.

Appellant, Liberty Mutual Insurance Company (Liberty), brought this action against several defendants, including appellee, Thunderbird Bank (Thunderbird), seeking to recover monies it had paid to its principal, the Charles Bruning Company (Bruning), under a fidelity bond. The trial court granted Thunderbird's motion for summary judgment, and after a formal written judgment containing the requisite language of Rule 54(b), Rules of Civil Procedure, this appeal was perfected.

The basic facts giving rise to this action are not in dispute. Between June 1, 1964 and March 24, 1967, James L. Coffelt was the Phoenix, Arizona, branch manager of the Charles Bruning Company. During the period from approximately April 1, 1966 to approximately March 20, 1967, Coffelt intercepted over 200 checks payable to his employer in the approximate sum of $179,000, and without authority appropriated the proceeds to himself.

Substantially all of the checks were cashed for Coffelt by Arnold Ong, owner of Gene's Modern Market in Glendale, Arizona, on the endorsement: "Charles Bruning Co. by J. L. Coffelt." Ong, in turn, endorsed the checks for deposit to his account at Thunderbird. The checks were then presented to the drawee banks in the normal course of banking business and charged to the accounts of the various customers of Bruning.

During the period involved, Liberty had a surety contract (sometimes referred to as a fidelity bond) with Bruning, insuring it against pecuniary loss sustained by reason of fraud, dishonesty, forgery, theft or embezzlement of its employees. Upon being notified by Bruning of the defalcation of Coffelt, Liberty paid Bruning the sum of $175,197.13, and received an assignment from Bruning of its claims against all of the defendants, including Thunderbird. In addition, under the terms of the fidelity bond, Liberty became subrogated to any claims Bruning had against the defendants.

Liberty then brought this action against Coffelt, Ong and Thunderbird. Cross-claims were filed by Thunderbird against Ong, and Ong against Coffelt. In addition, Thunderbird and Ong filed third-party complaints against Bruning. As previously indicated, the only issue before us on appeal is the granting of summary judgment to Thunderbird on Liberty's complaint.

For its defense to the suit by Liberty, Thunderbird contends that Liberty's claim and hence its remedy is equitable in nature. It argues that the claim is based upon the equitable doctrine of subrogation and that subrogation is only called into play to bring about an equitable adjustment between the parties. The theory holds that as between two innocent parties (the sure-

ty and the collecting bank), the equities do not balance in favor of the surety since it received compensation for undertaking the risk and the bank did not participate in the wrongful act of the employee.

The fundamental question which is to be decided in this case is whether, as a matter of law, Liberty has stated a claim against Thunderbird for which the law will allow recovery. This depends upon whether Liberty's claim is identical to that which Bruning could have asserted against Thunderbird, or whether it is a substituted claim based on equitable principles and brought into existence by the doctrine of subrogation. The issue is brought squarely into focus by reason of the "assignment" made by Bruning to Liberty which Liberty contends makes it unnecessary for Liberty to demonstrate "equities" superior to those of Thunderbird. In one sense, the ultimate question is whether the rights claimed here are legal or equitable in nature.

Our analysis must inevitably take us to the law of subrogation, but first it is necessary to examine the cause of action originally accruing to Bruning when it discovered that its checks had been misappropriated.

For the purpose only of this appeal, the parties do not dispute that Bruning could have recovered the stolen funds from Thunderbird. While it is recognized as a harsh rule, the payee of a check may recover the proceeds from an intermediate collecting bank when at the outset it was cashed elsewhere by means of a forged or unauthorized endorsement and payment has been procured from the drawee bank. See *Merchants and Manufacturers Association v. First National Bank,* 40 Ariz. 531, 14 P. 2d 717 (1932), where the court held:

A check made payable to an individual or corporation is an order on the drawee to pay the amount of such check out of the drawer's funds to the payee, and can be paid to no one else without the payee's consent or authority. If the drawee of the check pays it, or anyone else, bank or individual, in the course of business takes it with an unauthorized or forged indorsement, it is at the risk of having to make it good to the payee. [40 Ariz. at 536, 14 P.2d at 718.]

The theory of recovery in the *Merchants and Manufacturers Association* case was that the cashing bank was required to account to the payee for money had and received. Decisions in other jurisdictions have permitted recovery on theories of conversion and negligence. Whatever may be the nature of the cause of action, we need not dwell upon it in this case as it would be collateral to the issues before us. In general, see cases collected at 100 A.L. R.2d 670, "Right of check owner to recover against one cashing it on forged or unauthorized indorsement and procuring payment by drawee." See also 10 Am.Jur. 2d, *Banks,* § 632.

Turning to the facts of this case, we see that Bruning elected to sue neither the original drawers of the checks nor Thunderbird, but chose instead to recover the lost funds from Liberty under the fidelity bond protecting it against dishonest employees. Upon payment of the claim in full, Bruning assigned to Liberty its rights against all parties responsible for the loss. Although Thunderbird contends that recovery should be barred by reason of an election of remedies by Bruning, we have decided this case on other grounds and thus do not deal with this issue.

Having paid Bruning for the loss, does Liberty now stand squarely in the shoes of Bruning for the purpose of recovering against Thunderbird? Liberty contends that it does by reason of the assignment. Thunderbird contends that it does not, because the original claim has been discharged by Liberty's payment to Bruning and its rights are now equitable in nature as they arise by reason of subrogation. Thunderbird argues that the assignment can add nothing to these rights as they are created by operation of law.

**204**

A fidelity bond is a contract whereby, for a consideration, one agrees to indemnify another against loss arising from the want of honesty, integrity, or fidelity of an employee or other person holding a position of trust. Upon payment to an employer of a loss, the surety on a fidelity bond is subrogated pro tanto to any right of action which the employer may have against the defaulting employee. The surety's right to subrogation has also been held to extend to any right of action existing in favor of the employer against a third person who may have been involved with the defaulting employee or who was chargeable with notice of his wrongful acts, particularly where the third person benefited from the transaction. See 35 Am.Jur.2d, Fidelity Bonds and Insurance, §§ 1, 101.

The right to recover based on subrogation arises by operation of law under principles of equity, not by reason of contract. *D. W. Jaquays & Co. v. First Security Bank,* 101 Ariz. 301, 419 P.2d 85 (1966). It has been described by the Arizona Supreme Court as follows:

. . . Subrogation is the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt. It is a creature of equity, and was adopted from the Roman and not from the common law. Its purpose is the prevention of injustice and is the mode which equity adopts to compel the ultimate payment of a debt by one who in justice, equity and good conscience ought to pay it. It rests upon the principle that substantial justice should be attained, regardless of form. While the nature and grounds of subrogation are very clear, the difficulty arises in its application to the innumerable complications of business, and no general rule can be stated which will afford a test in all cases for its application. Whether it is applicable or not depends upon the particular facts and circumstances of each case as it arises.

[*Mosher v. Conway,* 45 Ariz. 463, 468, 46 P.2d 110, 112 (1935).]

We must first determine then whether the undisputed facts of this case give rise to recovery by way of subrogation against Thunderbird. We hold they do not.

A crucial factor leading to this conclusion is that Thunderbird, the collecting bank, did not deal with Coffelt, the dishonest employee. As is seen from the facts, Coffelt wrongfully endorsed the checks which were then, in each instance, cashed by Arnold Ong, doing business as Gene's Modern Market. Thereafter, Ong deposited the checks to his account at Thunderbird for collection. There is nothing in the record to show that Thunderbird had any connection with these transactions other than to handle the checks for collection upon Ong's direction and endorsement in the normal course of its banking business. While it is conceded that Thunderbird might have been liable to Bruning had the latter brought its claim against it, there is no basis in equity for Liberty to recover against Thunderbird on rights it derived by reason of subrogation. The right to subrogation does not exist in favor of a surety on a fidelity bond except against a person who participated in the wrongful act against the surety's principal.

We are aided in our analysis of this problem by several cases from other jurisdictions. A decision squarely in point and one relied on by Thunderbird is *Meyers v. Bank of America National Trust & Savings Assn.,* 11 Cal.2d 92, 77 P.2d 1084 (1938). The facts are strikingly similar to this case. A dishonest employee received checks payable to his employer and forged his endorsement. They were then negotiated to a person named Wascher who paid their face value to the dishonest employee and then placed them on deposit to his account with the defendant bank. The bank thereafter presented them to the respective drawees and received their face value which was credited to the account of Wascher. Discovering the loss, the employer recovered the full amount from the

surety on the fidelity bond. As in this case, the employer assigned all of its rights to recovery to the surety and a lawsuit followed against the collecting bank. Judgment in favor of the surety was reversed on appeal by the California Supreme Court on the ground that recovery depended upon a showing of superior equities which in this situation the surety was unable, as a matter of law, to demonstrate as against the bank. The court held:

> As stated hereinbefore, the right to maintain an action of this kind and to a recovery thereunder involves a consideration of, and must necessarily depend upon the respective equities of the parties. Here, the indemnitor has discharged its primary contract liability. It has paid what it contracted to pay, and has retained to its own use the premiums and benefits of such contract. It now seeks to recover from the bank the amount thus paid. It must be conceded that the bank is an innocent third party, whose duty to the employer was based upon an entirely different theory of contract, with which the indemnitor was not in privity. Neither the the indemnitor nor the bank was the wrongdoer, but by independent contract obligation each was liable to the employer. In equity, it cannot be said that the satisfaction by the bonding company of its primary liability should entitle it to recover against the bank upon a totally different liability. The bank, not being a wrongdoer, but in the ordinary course of banking business, paid money upon these checks, the genuineness of which it had no reason to doubt, and from which it received no benefits. [77 P.2d at 1089.]

This view of the respective rights of the parties has received general acceptance. See, for example, *Mill v. Lawyers Title Insurance Corp.,* 268 F.2d 313 (4th Cir. 1959); *American Surety Co. v. Bank of California,* 133 F.2d 160 (9th Cir. 1943); *Washington Mechanics' Sav. Bank v. District Title Ins. Co.,* 62 U.S.App.D.C. 194, 65 F.2d 827 (1933); *American Surety Co.*

*of New York v. Lewis State Bank,* 58 F.2d 559 (5th Cir. 1932); *Fidelity & Casualty of New York v. National Bank of Tulsa,* 388 P.2d 497 (Okl.1963); *Oxford Production Credit Ass'n. v. Bank of Oxford,* 196 Miss. 50, 16 So.2d 384 (1944); *National Surety Corporation v. Edwards House Co.,* 191 Miss. 884, 4 So.2d 340 (1941).

█ Liberty contends that equitable principles underlying subrogation do not apply because Bruning's right to recover against Thunderbird was transferred to it intact by reason of the written assignment. In support of this, Liberty relies upon *Aetna Casualty and Surety Co. v. Lindell Trust Company,* 348 S.W.2d 558 (Mo.Ct. App.1961). This case is not persuasive, however, for a number of reasons. First, the fact situation in *Aetna* involved company checks cashed for the dishonest employee directly by the defendant bank. Second, in finding the assignment of significance, the *Aetna* court stated that the effect of the assignment was to bottom the surety's claim upon a theory of "conventional subrogation" rather than "equitable subrogation," that is, subrogation based upon contract rather than that which arises by operation of law. The distinction is of little value, however, because recovery on a theory of "conventional subrogation" is nonetheless based upon equitable principles and the relative equities of the parties are still to be balanced. See 73 Am.Jur.2d, *Subrogation,* § 9.

Liberty, therefore, cannot recover on a theory that its rights were assigned to it by Bruning and thus avoid the necessity of showing that its equities are superior to those of Thunderbird. This is because the original claim belonging to Bruning has been paid and discharged by Liberty under the fidelity bond. The assignment adds nothing to the rights which Liberty acquired by reason of subrogation. The point is explained in the *Meyers* case, supra, as follows:

> Under these cases the conclusion seems inevitable that one who asserts a

right of subrogation, whether by virtue of an assignment or otherwise, must first show a right in equity to be entitled to such subrogation, or substitution, and that where such right is clearly shown by the application of equitable principles, an assignment adds nothing to his right thereto. Otherwise stated, where by the application of equitable principles, a surety has been found not to be entitled to subrogation, an assignment will not confer upon him the right to be so substituted in an action at law upon the assignment. His rights must be measured by the application of equitable principles in the first instance, his recovery being dependable upon a right in equity, and not by virtue of an asserted legal right under an assignment. [77 P.2d at 1086.]

Likewise, in *Louisville Trust Co. v. Royal Indemnity Co.*, 230 Ky. 482, 20 S.W.2d 71 (1929), the court said:

. . . We do not regard the assignment taken some time after the indemnity company had discharged its obligation as adding anything to the surety's right of action against the trust company. *Godfrey v. Alcorn*, 215 Ky. 465, 284 S. W. 1094, 51 A.L.R. 925. In the circumstances, its case depends altogether on the doctrine of subrogation, which is essentially a creature of equity, and is called into play only when it is necessary to bring about an equitable adjustment between the parties. * * * [20 S.W. 2d at 71.]

The principle is also set forth in *Bank of Fort Mill v. Lawyers Title Ins. Corp.*, 268 F.2d 313 (4th Cir. 1959) where the court held:

In the instant case, Lawyers contend that it is entitled to be subrogated to the right of Perpetual. By the overwhelming weight of authority, the right of subrogation is an equitable, rather than an absolute, right, applicable only where the equities of the party seeking subrogation are superior to those of the party against whom the right is asserted. See Note 1942, 137 A.L.R. 700. Also, it is the

general view that a paid surety has fewer equities than an innocent bank, since the surety company is paid to assume the specific risk. [Citations omitted.]

\* \* \* \* \* \*

It will be remembered that Lawyers took an assignment from Perpetual of all claims or causes of action arising out of the fraudulent transaction. There are several cases, from jurisdictions other than South Carolina, where a decision has been based on such an assignment, rather than on the right of subrogation. [Citations omitted.] These decisions were premised on the conception that the assignment converted the right to a legal right and prevented the Court from applying equitable principles. The fallacy in this reasoning is made clear in *American Surety Co. v. Bank of California*, supra, and in *United States Fid. & Guaranty Co. v. First Nat. Bank*, 5 Cir., 1949, 172 F.2d 258. As stated in *American Surety Co. v. Bank of California*, 133 F.2d at page 164: "If insurers have no right to subrogation, their position is not improved by the assignments to them of insured's claim against Bank."

Applying the holding of the court in that case to the facts of the instant case, when Lawyers paid Perpetual, the right of Perpetual to pursue its claim against the Bank was destroyed, as Perpetual would not be permitted a dual recovery; and, therefore, there was in existence no enforceable claim against the Bank which Perpetual could assign to Lawyers, and which would support recovery in favor of Lawyers. Assignment of a legal claim necessarily contemplates the continued existence of the claim assigned. The equitable doctrine of subrogation, on the other hand, presupposes a destruction of the claim by an actual payment and satisfaction of the claim by the party seeking subrogation. That Court cites as in accord: [citations omitted]. See also 6 C.J.S. Assignments § 3, setting forth the distinction between subrogation and assignment. There ap-

parently being no South Carolina decision on this particular point, we adopt what we believe to be the more reasonable and logical view that assignment creates no right greater than the equitable right of subrogation. [268 F.2d at 315–317.]

In conclusion, Thunderbird was neither a participant in the transaction bringing about the loss, nor a wrongdoer. Moreover, Liberty contracted with Bruning to indemnify it against the loss. It received a premium to take this risk, which, together with other premiums, provided the funds to cover it. It is a loss which is thus distributed among all policyholders as a contemplated risk. Liberty's contention that the loss should be shifted in equity to Thunderbird is without merit as the equities do not balance in its favor.

EUBANK, Judge (specially concurring).

While I agree with the disposition of this matter upon the equitable doctrine of subrogation, I do not agree that it is necessary or wise to give any credence to the "compensated surety" doctrine in the process of reaching a decision.

The compensated surety defense is this: a paid (or "compensated") surety is not entitled to be subrogated to the rights of its insured against a bank which would be legally liable for any wrongful payments made but which is innocent of any fraud. *See* O'Malley, "Subrogation Against Banks on Forged Checks," 51 *Cornell L.Q.* 441, 449–450 (1966).

The reason for the existence of the defense is shrouded in historical haze. All early sureties were gratuitous and thus received the protection of the courts. However, when suretyship became a business for profit, the courts rather quickly divested the paid sureties of their favored status, and the distinction between gratuitous and paid sureties became significant. Thus, parties were able to defend themselves in equity by asserting simply that their creditor's subrogor was a "compensated"—rather than "gratuitous"—surety. *See O'Malley, supra.*

I reject the compensated surety defense to the extent that it arises solely from the fact of the surety's being compensated for providing protection to the creditor. However, this does not mean that I am rejecting the applicability to these cases of the equitable concept of subrogation; I see no good reason to recognize that compensation paid to a surety will cause the surety to be disadvantaged one way or the other in equity. The relative rights of the parties must continue to be determined by subrogation, and this will always necessitate a balancing of the equities.

At the outset, several factors must be noted with respect to such a balancing. First, since we hold that this is a problem of subrogation, we ignore any attempt by a surety to avoid equity by transforming equitable proceedings into actions at law. We refer specifically to the use of an assignment of the creditor's rights against the collecting bank. Commonly, assignments in this type of litigation have been used in an attempt to circumvent the compensated surety defense, but their desired effect is also to eliminate all equitable defenses. In a suretyship problem, these assignments are superficial devices which should not succeed in depriving equity of its jurisdiction.

Suretyship relations, and attendant rights of subrogation, are defined in terms of equitable principles. I am not saying that I am affirming the equitable nature of subrogation because it always has been so; traditional responses to this problem are not adequate to explain why an assignment to a surety will be ineffective. Rather, I say that subrogation is a concept which has no meaning outside of its foundation in suretyship, and a surety's rights cannot have an independent, contractual base. Unless this were true, a surety would not be a surety, but simply an assignee or transferee, and I cannot see allowing a business to mantle itself in equitable protections and call itself a surety,

but also to be permitted to sue at law when it appears more advantageous. Further, suretyship is regulated in Arizona as a part of the Insurance Code as is the specific conduct insured against in this matter. *See* A.R.S. § 20–257.

Second, I do not consider an assumption of risk by the surety to be an "equity" which must be balanced. Of course, the surety is in the business of assuming these risks, but to use this in the balancing process would be nothing more than a method of penalizing a compensated surety. Since I have explicitly rejected the compensated surety defense, it would be inconsistent for the same considerations to be utilized implicitly in this manner.

Third, the wrongful payment of money by the bank, despite its legal impropriety, does not by itself constitute an equity in favor of the surety. However, if the payment is negligent, or intentional, then equities may rise in the surety's favor.

Finally, it should be noted that the compensated surety defense apparently was devised in order to resolve questions in which both parties appeared to be equally free from fault. *See* Comment, "The Right of a Paid Surety to Subrogation," 44 *Marq.L.Rev.* 194, 198 (1966). In other words, the defense has been used effectively to avoid reaching hard decisions. I suggest that in no instance are the equities perfectly balanced and that one party can always show a superior equity to the other without resort to such substitutes for analysis.

When I examine and balance the equities in this litigation, I determine that Liberty Mutual cannot be subrogated to Bruning's rights against Thunderbird; the equities are balanced in favor of the bank. The bank behaved reasonably, regardless of any absolute liabilities imposed by statute or by contract. In an economy which relies so heavily upon bank drafts and other negotiable instruments, it is unrealistic to expect a collecting bank to verify every prior endorsement, as well as the authority of the prior endorsers, on a depositor's check.

Moreover, since Liberty Mutual stands in the shoes of Bruning, any negligence attributable to Bruning also must be attributable to Liberty Mutual. The record shows that Coffelt's embezzlement occurred over an 11½ month period and involved over 200 checks totalling nearly $179,000. Arguably, Bruning was negligent in installing Coffelt in this position of trust to begin with; certainly, Bruning was negligent in failing to discover this extended defalcation before it did.

Therefore, since subrogation will not lie between the parties to this appeal, the trial court properly granted Thunderbird's motion for summary judgment. I would therefore affirm the judgment.

JACOBSON, Presiding Judge (dissenting).

I respectfully dissent from the result reached by the majority of this court.

The opinion of Judge Froeb and the opinion of Judge Eubank are both based upon the proposition that the rights of Liberty Mutual in this case arise solely from the equitable doctrine of subrogation, that is, subrogation is only called into play to bring about an equitable adjustment between the parties. The theory then continues that as between two innocent parties (the surety company and the collecting bank), the equities weigh in favor of the collecting bank, or the equities are balanced and since the surety received compensation for undertaking its risk, the loss should equitably fall upon the surety. *See Meyers v. Bank of America Natl. Trust & Savings Ass'n.*, 11 Cal.2d 92, 77 P.2d 1084 (1938); *Fidelity & Casualty Co. v. National Bank*, 388 P.2d 497 (Okla.1963).

Liberty Mutual makes the following contentions as to the defense:

1. The defense is based upon faulty logic and should not be applied at all,

2. That if applied, Thunderbird's liability is based upon negligence or con-

version (a wrongdoer) and therefore the equities between the parties are not equal and under the doctrine of subrogation it should prevail, and

3. That in any event, it obtained a legal assignment of Charles Bruning Co.'s rights and equitable doctrines should not be considered.

In my opinion, to resolve these issues, it is first necessary to analyze the nature of the underlying liability of Thunderbird as a collecting bank to the original payee, Charles Bruning Company. For purposes of this analysis, I take as a fact (because this matter comes to us by way of summary judgment) that Thunderbird received these checks bearing the unauthorized endorsement of the payee, and that the payee was not negligent nor did it ratify the unauthorized endorsement.

It appears to be well settled that a collecting bank is liable to the original payee whose unauthorized endorsement appears on the check. *Merchants and Manufacturers Ass'n. v. First National Bank,* 40 Ariz. 531, 14 P.2d 717 (1932); 6 Michie on Banks & Banking, Ch. 10, § 80 at 179 (1952); Annot. 100 A.L.R.2d 670 (1965). While this liability is well settled, the theory upon which the liability rests is not.

Some cases utilize the theory that the payee may ratify the check on the drawee bank and that the collecting bank is then liable to the payee for monies had and received. *United States Portland Cement Co. v. United States National Bank,* 61 Colo. 334, 157 P.202 (1916); *Bell-Wayland Co. v. Bank of Sugden,* 95 Okl. 67, 218 P. 705 (1923); *George v. Security Trust & Savings Bank,* 91 Cal.App. 708, 267 P. 560 (1928).

I have some difficulty with this theory since the common count of money had and received (assumpsit) was based upon the theory that the defendant had money belonging to the plaintiff which in equity and conscience should be paid to the plaintiff. *See* 1 Am.Jur.2d, *Actions* § 13 at 553 (1962). In the case of the collecting bank,

the payee's money has passed out of the collecting bank's hands in the form of cash or credit to its depositor. Moreover, the selective ratification utilized in this theory is suspect, for if the payee ratifies the payment by the drawee bank, does the payee not also ratify the unauthorized endorsement which is the basis of the payment by drawee and thus defeat the action against the collecting bank?

Other cases hold that as to the true payee of the check, the collecting bank has intermeddled with the check (by treating the check as genuine and collecting from the drawee) to the exclusion or disregard of the rights of the true owner and that this amounts to a conversion of the payee's funds for which an action will lie. *See Good Roads Machinery Co. v. Broadway Bank,* 267 S.W. 40 (Mo.App.1924); *Evenson v. Waukesha Natl. Bank,* 189 Wis. 170, 207 N.W. 415 (1926); *Moler v. State Bank,* 176 Minn. 449, 223 N.W. 780 (1929). Again, in my opinion, such a theory has a twinge of artificiality about it, for the act of conversion, that is receiving the check for collection from the drawee bank, while technically qualifying as a conversion by the exercise of dominion over the check contrary to the rights of payee, is not the act which caused the payee's loss—that act was the original unauthorized endorsement which put into action a series of events, of which the collecting bank's accepting the check in the normal course of business is merely one of the steps, resulting in ultimate damage.

Still other cases hold that the collecting bank in acting upon the endorsement of negotiable papers is under a duty to ascertain the genuineness of prior endorsements and that the bank can be negligent in failing to act diligently in exercising this duty. *See Massey-Ferguson, Inc. v. Fargo National Bank,* 270 F.Supp. 227 (D.C.N.D. 1967) aff'd. 400 F.2d 223 (8 Cir. 1968); *Gresham State Bank v. O and K Construction Co.,* 231 Ore. 106, 370 P.2d 726 (1962). I have further difficulty with this theory. If negligence is cast in terms of failure to

act as a reasonable and prudent person, I first am unable to see how that reasonable person has the means to discover whether or not endorsements occurring prior to that of its depositor are genuine; and, second, if such means are available to it, how it can exercise these means of discovery on the thousands of third-party checks which pass through its offices each day without bringing the present check-oriented economy to a screeching halt. In short, while the law of negotiable instruments requires that endorsees of checks warrant the genuineness of prior endorsements, this is a warranty imposed by the nature of the instrument and the protection of commercial transactions, not because the duty imposed is that which is associated with the law of negligence.

In my opinion, the liability of the collecting bank to the payee should be predicated upon the nature of the occurrence which gives rise to the payee's loss—the forgery or unauthorized endorsement. The Negotiable Instruments Act, which is the embodiment of common law on this subject, states that such an instrument is "wholly inoperative."[1] Being wholly inoperative, the obligation of the original maker of the check to the payee remains intact. Thus, in the absence of an agreement to the contrary, the payee could sue the maker on the original obligation. *Steele v. Vanderslice,* 90 Ariz. 277, 367 P. 2d 636 (1961). The maker in turn has a cause of action against the drawee bank for wrongfully paying his money. *Valley Natl. Bank v. Electrical Dist. Number Four,* 90 Ariz. 306, 367 P.2d 655 (1961). The drawee has a cause of action against the collecting bank for breach of its warranty as to the genuineness of prior endorsements. *P & H Finance Co. v. First State Bank,* 185 Okl. 558, 94 P.2d 894 (1939). The col-

lecting bank has a cause of action against its depositor on the same theory and the depositor has a cause of action against the forger who started the unholy mess. By allowing suit by the payee directly against the collecting bank, multiplicity of suits is avoided. *See, National Union Bank v. Miller Rubber Co.,* 148 Md. 449, 129 A. 688 (1925). As a practical matter, the suit by the payee against the collecting bank, puts into motion the round robin of litigation outlined, as is evidenced by the cross-claims and third party complaints filed in this action.

In my opinion then, the most sound and practical theory upon which the liability of the collecting bank can be predicated is upon its warranty of prior endorsements and the avoidance of multiplicity of actions.

Having thus established the character of the collecting bank's liability, I find no reason why a claim based upon that liability is not assignable, *see, Deatsch v. Fairfield,* 27 Ariz. 387, 233 P. 887 (1925), nor do I find anything in that character to classify it as a wrongdoer so as to avoid the equitable defense of compensated surety, if that defense is valid.

I turn then to the defense of the compensated surety itself. As previously indicated, this defense is predicated upon the equitable doctrine of subrogation. The defense is adequately set forth in the case of *Louisville Trust Co. v. Royal Indemnity Co.,* 230 Ky. 482, 20 S.W.2d 71 (1929):

"In the circumstances, its [the surety's] case depends altogether on the doctrine of subrogation, which is essentially a creature of equity, and is called into play only when it is necessary to bring about an equitable adjustment between the parties. . . . The case is one between a

---

1. At the time these transactions occurred, the Negotiable Instruments Act was in effect. A.R.S. § 44–423 (1956) of that Act provided:
    "When a signature is forged or made without the authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instru-

ment, or to give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party against whom it is sought to enforce such right, is precluded from setting up the forgery or want of authority."

paid surety and the trust company, whose negligence is claimed caused the loss. It must be conceded that the rule that makes the trust company liable to the Credit Clearing House Adjustment Corporation, is to say the least, a hard one.

"In its beginning the doctrine was applied with respect to deposits of public officers, guardians, and trustees, in whose selection or discharge the insured beneficiary or cestui que trust had no voice. It is now applied to the defalcation of agents subject in all respects to the will of their principal. Under that rule the bank must look to the sources of the deposits of all its depositors and see to it that the depositor does not pay out money except in the capacity in which the money should have been deposited. Since the duty thus imposed will operate as a poor check on an agent who has made up his mind to defraud his employer, it would seem that the proximate cause of loss is the dishonesty of the agent rather than a want of care on the part of the bank. Therefore, as between the employer and the bank, there is much to be said in favor of the position that the loss should fall on the employer who selects an unfaithful agent, and thus vouches for his integrity, rather than on the bank whose officers in many instances are called upon daily to examine and keep account of a large number of checks, a duty which, to say the least, operates a severe strain on ordinary care. Though the rule as between the bank and the employer is settled, yet, in view of its extreme harshness, we are not inclined to go further and hold that the equities of a surety that has been paid to bear the loss are superior to those of the bank that receives no benefit from the transaction." 20 S.W.2d at 71–72.

The defense has received somewhat wide acceptance. See, Meyers v. Bank of America Natl. Trust & Savings Ass'n., supra, 11 Cal.2d 92, 77 P.2d 1084 (1938); Fi-

delity & Casualty Co. v. National Bank, supra, 338 P.2d 497 (Okl.1963); American Surety Co. v. Lewis State Bank, 58 F.2d 559 (5th Cir. 1932); Washington Mechanics' Sav. Bank v. District Title Ins. Co., 62 U.S.App.D.C. 194, 65 F.2d 827 (1933); National Surety Corp. v. Edwards House Co., 191 Miss. 884, 4 So.2d 340 (1941); Bank of Fort Mill v. Lawyers Title Insurance Corp., 268 F.2d 313 (4th Cir. 1959); American Surety Co. v. Bank of California, 133 F.2d 160 (9th Cir. 1943); McNeil Construction Co. v. Livingston State Bank, 185 F.Supp. 197 (D.Mont.1960) aff'd 300 F.2d 88 (9 Cir. 1962); Oxford Production Credit Ass'n. v. Bank of Oxford, 196 Miss. 50, 16 So.2d 384 (1944).

As previously indicated, the bottom upon which the defense rests is that the rights of the compensated surety to step into the shoes of its principal are derived through the doctrine of subrogation—an equitable doctrine attendant with all the equitable defenses of competing equities. Undoubtedly, in the case of a surety, this was at one time true, as the equitable doctrine of subrogation had its origin in the surety-principal relationship. See, Pomeroy's Equity Jurisprudence Vol. 4, § 1211 (5th ed. 1941). Thus, the surety of a defaulting principal debtor was allowed to obtain as a means of repayment all securities or other remedies in the hands of the creditor without the necessity of a written agreement to this effect. See 73 Am.Jur.2d, Subrogation, § 53–61. It was an expression of a court of equity to compel the ultimate discharge of an obligation or debt by the one who in good conscience ought to pay it, and is founded on the maxim that no one will be enriched by another's loss. In re Farmers' & Merchants' State Bank, 175 Wash. 78, 26 P.2d 631 (1933).

As can be seen the equitable doctrine of subrogation had its origins in the debtor-creditor relationship, to avoid unjust enrichment. However, the contracted right of an insurer to the rights held by its insured in my opinion does not rest upon such a basis. In this regard I view a fi-

delity surety as an insurer of the trustworthiness of its insured employees. While unjust enrichment may still linger in the background in the insurance subrogation field, obviously the right to an assignment of the rights of the insured rests on legal contractual obligations entered into between the parties rather than upon equitable principles of unjust enrichment. Moreover, these contractual rights exist regardless of the conduct of third parties or their equities.

These contractual assignment rights have been referred to as "conventional" subrogation as compared to "legal" subrogation which takes place as a matter of equity, without agreement to that effect and which comes into being with the person paying the debt. *First Natl. Bank v. American Surety Co.,* 71 Ga.App. 112, 30 S.E.2d 402 (1944). Whether we can refer to these rights as "conventional" or "legal" subrogation in my opinion is somewhat immaterial in this setting. The problem remains as to whether or not the courts will allow enforcement of those contract rights unattended by the trappings of equity.

The results have been mixed. If head counting is to be the measure of a "majority" and "minority" rule, it would appear that the umbilical cord of equity birth giving rise to the doctrine of subrogation will not be cut by a majority of courts, even though the surety's rights arise by legal contractual rights or assignment. Illustrative of this rule is *Meyers v. Bank of America Natl. Trust & Savings Ass'n., supra,* 11 Cal.2d 92, 77 P.2d 1084 (1938):

"[T]he conclusion seems inevitable that one who asserts the right of subrogation, whether by virtue of an assignment or otherwise, must first show a *right in equity,* to be entitled to such subrogation, or substitution, and that where such right is clearly shown by the application of equitable principles, an assignment adds nothing to his rights thereto. Otherwise stated, where by the application of equitable principles, a surety has not been found not to be entitled to subroga-

tion, an assignment will not confer upon him the right to be so substituted in an action at law upon the assignment. His rights must be measured by the application of equitable principles in the first instance, his recovery being dependable upon a right in equity, and not by virtue of an asserted legal right under an assignment." 77 P.2d at 1086–87 (emphasis in original)

*See also, American Surety Co. v. Lewis State Bank,* 58 F.2d 559 (5th Cir. 1932); *Louisville Trust Co. v. Royal Indemnity Co.,* 230 Ky. 482, 20 S.W.2d 71 (1929); *American Surety Co. v. Bank of California,* 133 F.2d 160 (9th Cir. 1943) (coming to the same result but on the theory payment by the surety company destroyed the claim by the principal against the bank so nothing remained to be assigned. A questionable theory to say the least); *American Central Ins. Co. v. Weller,* 106 Or. 494, 212 P. 803 (1932); 73 Am.Jur.2d, *Subrogation* § 9. There is, however, authority to the contrary; *First Natl. Bank v. American Surety Co., supra,* 71 Ga.App. 112, 30 S.E.2d 402 (1944); *Aetna Casualty & Surety Co. v. Lindell Trust Co.,* 348 S.W. 2d 558 (Mo.App.1961).

The problem I have in applying the rule enunciated in *Meyers, supra,* is the assertion that the surety's rights to an assignment of its principal's claim must be founded in equity. As previously stated, this was historically true, but does that mean that merely because of principle of law had its origin in equity, the parties as between themselves, cannot contractually make those principles legally binding? Or put more directly, does the fact that the legal theory has origin in equity, require an application of equitable defenses, even though a compatible theory existed at law, without these defenses? I see no logical reason for making such a requirement, especially when the law recognizes the assignability of the claim here involved. *Deatsch v. Fairfield, supra,* 27 Ariz. 387, 233 P. 887 (1925). Moreover, it appears somewhat incongruous that principles of

equity and fairness which admittedly give rise to a right of subrogation to prohibit an injustice are now invoked to prohibit enforcement of that right. No one seriously argues that the payee's cause of action against the bank is not assignable, nor that a third party assignee could not maintain the action at law. What then happens to the maximum of equity that "equity follows the law and does not supersede it?"

Logically, probably the most basic problem underlying the defense of the compensated surety is the glaring fact that the true payee of the forged endorsement check has a valid cause of action against the collecting bank, and but for the payment by the fidelity surety, the bank would have to pay that payee the amount of its loss. Should the bank complain that it had to pay A $175,000, as compared to B who was owed the money, especially when all the defenses it has against B are available against A? *See* A.R.S. § 44–144. Insofar as the bank is concerned, it reaps a windfall because B had the foresight to be insured against the loss for which the bank is liable, thereby in some manner extinguishing its debt, through no action of its own. In this regard, the defense smacks of derogation of the collateral source rule applied in tort actions.

I am convinced that the application of the compensated surety defense in cases where a valid assignment exists, does not have its origin in logic, but in the reluctance of courts to enforce what many consider a harsh rule—the liability of the collecting bank to the payee. The temptation to yield to this reluctance is not without appeal, for, in essence, the law requires an "innocent" party to bear a loss for which it was not initially responsible, nor against which it could reasonably guard. This is a risk, however, that the bank undertook when it became engaged in the banking business. I find no logical reason why the claim of the payee against the bank is not assignable. Being assignable, I find no logical reason why the surety merely because it received a premium for undertaking the risk which resulted in the assignment, should not be entitled to enforce that assignment.

I would therefore hold that the security company, having a contractual right to an assignment of its principal's claim against the collecting bank, receives such a claim subject to all the defenses available against its principal, but only such defenses—the defense of the compensated surety or equitable subrogation not being one of these.

Because the trial court based its judgment in favor of the bank on the viability of the defense of compensated surety, I would reverse the judgment and remand the matter to the trial court for further proceedings.